**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CIVIL ACTION COMPLAINT
NUMBER**

**JURY TRIAL DEMANDED**

**DERRICK JACOBS,**
*PLAINTIFF*

**V.**

**CITY OF PHILADELPHIA, LAWRENCE KRASNER, MICHAEL GARMISA,
HARVEY BARTLE III, PATRICIA CUMMINGS, TRACY TRIPP, DAVID
SMITH, JOHN DOE AND JANE DOE, et al**
*DEFENDANTS*

**<u>FEDERAL CIVIL RIGHTS COMPLAINT</u>**

**AND NOW**, Plaintiff, Derrick Jacobs, proceeding pro se, hereby files the following Civil Action Complaint for damages against City of Philadelphia, Philadelphia District Attorney Lawrence Krasner, Philadelphia Assistant District Attorney Michael Garmisa, Harvey Bartle III, Patricia Cummings, Tracy Tripp, David Smith, John Doe and Jane Doe ("Defendants") and in support thereof avers as follows:

**<u>SUMMARY ARGUMENT</u>**

In 2017 Lawrence Krasner won the election to become the next District Attorney of Philadelphia after former Philadelphia District Attorney R. Seth Williams was indicted, arrested, and convicted of corruption.

Krasner's corruption is far more egregious than Williams.

Immediately after Krasner's election (November 2017) he began his premeditated criminal activity.

The criminal activity included targeting law enforcement officers and prosecutors for financial gain.

When the plaintiff attempted to expose Krasner's criminal enterprise, he used his Office to retaliate against the plaintiff.

In furtherance of his criminal activities, Krasner solicited Defendants to conspire in his retaliation by assuring numerous Constitutional Rights afforded to Plaintiff were intentionally violated.

1

Defendants latest act of corruption and retaliation, amongst a continuing stream, is defaming Plaintiff and portraying Plaintiff in a false light in retaliation for exposing their corruption.

Defendants' actions against Plaintiff are unlawful and criminal. As a result, the plaintiff request damages in excess of $75,000.00.

Upon his inauguration, Krasner arranged to have the **"adjudicated"** Ryan Pownall Officer Involved Shooting returned to the Philadelphia District Attorney's Office.

His "transition" team obtained homicide case files.

Krasner solicited perjury from witnesses.

Krasner tampered and destroyed evidence in the homicide case files.

Krasner illegally arrested law enforcement officers and released convicted murderers with this illegal activity.

Krasner then conspired with the Philadelphia City Solicitor's Office and defense attorneys to pay the released convicted murderers millions of taxpayer dollars.

In 2018, armed with this knowledge, former Philadelphia Police Detective Derrick Jacobs ("Jacobs", "Plaintiff") continually informed his superiors (confirmed by Jacobs' Commanding Officer Jason Hendershot during deposition) of Krasner's criminal activity.

In September 2018 Jacobs consulted with a Fraternal Order of Police ("FOP") attorney.

Defendant, Assistant District Attorney Tracy Tripp, observed the consultation. Tripp reported her observations to Krasner, who ordered her to circumvent Plaintiff's Constitutional Rights, and obtain the nature of Jacobs' privileged communications with the FOP attorney through his Commanding Officer, Jason Hendershot.

Jacobs informed Hendershot his consultation was regarding the criminal activity at the Philadelphia District Attorney's Office (a conversation Jacobs has had with Hendershot on numerous occasions).

Krasner then proceeded with "his" DAO pattern and practice of targeting sworn law enforcement officers with fabricated illegal criminal investigations/prosecutions.

Krasner ordered Tripp to threaten Jacobs and his partner, Detective William Sierra, with Contempt of Court charges for leaking grand jury information in the fabricated Pownall investigative grand jury.

2

Neither Jacobs or Sierra participated in the Pownall investigative grand jury other than being sworn in as investigators.

Hendershot testified during a deposition that he informed his superiors of the DAO criminal activity against Jacobs and Sierra.

On August 1, 2019, Tripp informed Jacobs she had "withdrawn" the criminal prosecution against Jacobs.

On October 4, 2019 Jacobs filed a civil complaint against the defendants (19-cv-4616).

On March 21, 2024 Judge Harvey Bartle III ("Bartle") authored a Memorandum with numerous intentional criminal fabrications and omissions.

Bartle issued Order (ECF 186 and 187 respectively) GRANTING the Defendants' Motion for Summary Judgment. The Memorandum "clearly was not" the result of "material and factual" evidence in the record; suffice to say the Memorandum did not reflect any material facts in the record, and was the result of a clear biases against the plaintiff and ex parte communications with the defendants by the Court.

On April 4, 2025, armed with Bartle's conspiratorial criminal memorandum, Defendants continued their retaliation against the plaintiff, citing Bartle's criminally fabricated Memorandum (ECF 186). On April 4, 2025 the Defendants decided to continue the irreparable damage and destruction of the Plaintiff's career when they sent him a "Brady/Giglio" letter intentionally defaming him.



**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
215-686-8000

April 4, 2025

Derrick Jacobs

███████████

████████████

█████████████████████

Re:    Derrick Jacobs (Payroll: 223879)
       Notification letter
       DAO *Brady/Giglio* disclosure of rebuttable presumption information

Dear Mr. Jacobs:

The District Attorney's Office has learned of *Brady/Giglio* information relating to a judicial finding by United State District Judge Harvey Bartle III, including but not limited to findings that you "revealed grand jury information" to a criminal defense attorney and "revealed confidential information on a podcast."

Sincerely,

*M Garmisa*

Michael Garmisa
Assistant District Attorney
Supervisor – Conviction Integrity Unit

Defendants knowingly, intentionally, and negligently defamed Jacobs in retaliation for him exposing their criminal activity and corruption. The actions of the Defendants clearly violated the Plaintiff's Constitutional Rights. **There was not and will never be any "findings," other than the criminally coordinated activities of Defendants.**

4

**NATURE OF THIS ACTION**

1.      On May 16, 2017, Lawrence Krasner won the Philadelphia District Attorney Democratic primary.

2.      On June 8, 2017, Philadelphia Police Officer Ryan Pownall was involved in an Officer Involved Shooting ("OIS") that killed David Jones.

3.      On November 3, 2017, Senior Pennsylvania Deputy Attorney General Christopher Phillips informed Jacobs the OIS was determined to be justified by the Pennsylvania Attorney General's Office ("AGO") and no criminal charges would be brought against Pownall.

4.      On November 7, 2017, Lawrence Krasner ("Krasner") won the election to become the next Philadelphia District Attorney.

5.      On November 13, 2018 Asa Khalif ("Khalif") aka Earl Pittman stormed the Pennsylvania Attorney General Office where the meeting was held with Terrance Freeman, Senior Deputy Attorney General Christopher Phillips, and Plaintiff on November 3, 2017.

6.      In January 2018, Krasner assumed the office of Philadelphia District Attorney.

7.      One of Krasner's first official actions as District Attorney was retrieving the Pownall OIS prior to the AGO announcement of no criminal charges.

8.      On January 13, 2018 Stefon Crawley attempted to kill multiple police officers with a stolen firearm and extended magazine in the area of 2865 Kensington Avenue.

9.      Prior to Krasner becoming Philadelphia District Attorney, Philadelphia Police Detective Derrick Jacobs ("Plaintiff" and/or "Jacobs") had served honorably as a sworn Law Enforcement Officer ("LEO") for more than two decades.

10.     In 1996 Jacobs took the Oath to become a sworn LEO, which read as follows: *I, Derrick Jacobs, solemnly swear that I will support, obey, and defend the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania, Home Rule Charter of Philadelphia, and ordinances of the City of Philadelphia; and abide by all the rules and regulations of the Philadelphia Police Department without consideration…; and that I will discharge the duties of my office with fidelity."*

11.     Jacobs was nominated for "Officer of the Year" as a rookie.

12.     Jacobs was promoted to the rank of Detective in 1998.

13.     Jacobs was transferred to the Homicide Division in 2011.

5

14.    Jacobs was handpicked and asked to join the Officer Involved Shooting Investigation Unit ("OISI") in 2017 after a recommendation from the Department of Justice ("DOJ").

15.    During Jacobs' career as a Law Enforcement Officer ("LEO") he has received a multitude of commendations and awards, up to and including Bravery.

16.    None of that mattered in September 2018 after Jacobs attempted to report "**unprecedented**" acts of corruption at the Philadelphia District Attorney's Office ("DAO"). Those acts continue to this very day.

17.    Krasner's venomous attitude toward sworn law enforcement officers and prosecutors foresaw premeditated criminal activity against those identified public servants.

18.    Those acts of corruption included, but not limited to, the illegal prosecution/investigation of innocent law enforcement officers, including Jacobs.

19.    Those acts of corruption included, but not limited to, the illegal release of convicted murderers through the subordination of perjury, bribery, fabrications and destruction of court documents.

20.    In 2017/2018 Jacobs observed and/or learned of numerous acts of criminality and corruption at the Philadelphia District Attorney's Office ("DAO," "Krasner's DAO," "Defendants").

21.    These acts included, but were not limited to, tampering with evidence, destruction of evidence, soliciting perjury, witness tampering, falsifying documents, preparing false affidavits, obtaining illegal warrants, and bribery.

22.    In May of 2018 Jacobs learned Philadelphia Chief of Homicide, Anthony Voci, was attempting to get convicted murderers released from prison through bribery. The convicted murderers were bribed to say their confessions was coerced or they were victims of prosecutorial misconduct.

23.    One of the convicted murderers was investigated by Jacobs and his partner.

24.    Voci was overheard telling colleagues the murderer's confession was "airtight."

25.    Also in May of 2018, Jacobs along with Detective Brian Newell were contacted for the first time by Philadelphia Assistant District Attorney Tracy Tripp. Jacobs learned Tripp was convening an investigating grand jury against Philadelphia Police Officer Ryan Pownall for the OIS on June 8, 2017.

26.    In September 2018 Jacobs learned the DAO had solicited perjury from at least two witnesses to charge Pownall with Murder as a result of the OIS on June

6

8, 2017. The witnesses were witness #3 and witness #6. Jacobs had previously interviewed both witnesses.

27.  The DAO bribed witness #3 for his perjured testimony.

28.  Witness #6 was a friend/associate of David Jones.

29.  On September 27, 2018 Jacobs was coordinating a homicide trial in courtroom 1007, which he was the assigned investigator.

30.  On September 27, 2018 Fraternal Order of Police ("FOP") attorney Fortunato "Fred" Perri was in courtroom 1005 representing Pownall on the fabricated Murder charges placed against him by the DAO.

31.  Jacobs observed Perri and they engaged in a brief consultation regarding the corruption and criminality at the DAO on orders from Krasner.

32.  Tripp observed the consultation and immediately reported her fears of Jacobs attempting to expose their corruption to Krasner and Cummings. *Note: Jacobs had never met Tripp before May 2018 and his only contact was regarding Police Officer Ryan Pownall's OIS.*

33.  After Tripp's consultation with Krasner and Cummings, she contacted Jacobs' Commanding Officer, Lieutenant Jason Hendershot ("Hendershot").

34.  Tripp enlisted Hendershot's "services" to obtain Jacobs' privileged communications with Jacobs' FOP attorney.

35.  At no time did Tripp inform Jacobs' Commanding Officer (Hendershot) of a "grand jury leak."

36.  In fact, Hendershot testified when he learned of the "grand jury leak" fabrication he informed his superiors and "others" of Tripp's and the DAO lies against Jacobs and Sierra.

37.  On October 16, 2018 Jacobs received a court notice from Tripp for October 18, 2018. The remarks section read Confid C-55.

38.  As a result of the remarks section, Jacobs immediately emailed Tripp (10/16/18) and asked if the court notice was "sent in error."

39.  Tripp responded by stating the notice was not sent in error and "there is some additional investigation required at this time."

40.  ***At no point, prior to October 16, 2018 did Tripp or anyone else from the DAO, including Krasner, inform ANY of Jacobs' superiors or Jacobs of a "grand jury leak."***

41.     On October 18, 2018, Jacobs along with his partner, William Sierra, appeared as a result of receiving court notices from Tripp.

42.     Jacobs subsequently learned the DAO fabricated a "grand jury leak" story against Jacobs and his partner to chill Jacobs' speech and keep Jacobs from exposing their corruption.

43.     Jacobs' attorney, Greg Pagano, informed Jacobs Tripp and the DAO "wanted Jacobs to remain silent until after the Pownall trial."

44.     Jacobs and his partner never participated in the grand jury, other than being sworn in.

45.     Due to the DAO criminal activity, on November 2, 2018 Jacobs sent Tripp an email informing her ALL communications with Jacobs will be in "written form or email."

46.     The fabricated defamatory *per se* accusations against Jacobs originated entirely from false claims made by Tracy Tripp, and were authorized and filed by Lawrence Krasner's DAO.

47.     Krasner, Cummings and Tripp were fully aware the accusations lacked any factual basis and were only retaliatory.

48.     Jacobs' Commanding Officer, Jason Hendershot, testified he informed his chain of command and "others" of the false and fabricated allegations against Jacobs.

49.     Jacobs was the original "Whistleblower" exposing Krasner's DAO corrupt practices. Practices that have since been confirmed and verified by multiple Courts.

50.     Since Jacobs initial attempts to expose the defendants' corruption, a multitude of judges have found that several claims made by Krasner and the DAO under his leadership in their capacity as attorneys were "unreliable," malicious, and/or "lacked candor."

51.     This reckless disregard for the truth underscores Defendants' complicity in perpetuating false and damaging narratives.

52.     The emotional and reputational damage caused by the defendants was entirely foreseeable and nothing short of catastrophic to Jacobs and his family. They have shattered his sense of self and left a lasting scar that no apology could ever undo.

## **JURISDICTION AND VENUE**

53.     This action is brought under 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. 1988.

8

54.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

55.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## PARTIES

56.     Pro Se Plaintiff, Derrick Jacobs ("Plaintiff"/ "Jacobs") is a citizen of the United States and all times relevant was a resident in the City and County of Philadelphia.

57.     Defendant, City of Philadelphia ("City") is a municipality.

58.     Defendant, Lawrence Krasner ("Krasner") is an adult male employed and residing in City and County of Philadelphia.

59.     Defendant, Patricia Cummings ("Cummings") is/was an adult female employed by the City of Philadelphia during all relevant times.

60.     Defendant, Tracy Tripp ("Tripp") is/was an adult female employed by the City of Philadelphia during all relevant times.

61.     Defendant, Michael Garmisa ("Garmisa") is/was an adult male employed by the City of Philadelphia during all relevant times.

62.     Defendant Frank Vanore ("Vanore") is an adult male employed by the City of Philadelphia during all relevant times.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

*Krasner's "PREMEDITATED CRIMINAL ACTIVITY" and attacks on sworn Law Enforcement Officers and Prosecutors through and under the guise of his "Progressive" ideology and policies were clearly foreseeable.*

63.     In May of 2017 Krasner won the Philadelphia Democratic primary for District Attorney.

64.     In November 2017 Krasner won the election for Philadelphia District Attorney.

65.     After Krasner's victory he created a "transition team" prior to his inauguration.

66.     The "transition team" included, but was not limited to, Patricia Cummings, Anthony Voci, Lawrence Krasner and others (John and Jane Does).

9

67. This "transition team" of lawyers and Krasner began requesting numerous homicide case files.

68. Krasner requested then DAO Assistant Chief of Homicide, Edward Cameron, obtain these files from the Philadelphia Police Department Homicide Division.

69. The majority of the files were homicide cases of ten (10) years or older and cases where the homicide investigators and prosecutors had retired.

70. The homicide cases requested also were for law enforcement officers and prosecutors "targeted" by Krasner.

71. When the files were "returned" by Krasner's "transition team," several pieces of evidence and documents that were previously in the files when they were "obtained" by Krasner's "transition team," now were missing. The evidence was presumed stolen and destroyed.

72. Several complaints were made by the Philadelphia Police Department ("PPD") and Assistant District Attorney Edward Cameron ("Cameron") about the files being returned with missing and destroyed evidence.

73. The tampered and destroyed files coincided with the conspiratorial deployment of defense attorneys and attorneys from the Philadelphia Public Defender's Office descending on prisons "consulting" with the convicted murderers associated with the tampered and destroyed files.

74. The destroyed and tampered files also coincided with Krasner's DAO criminal "exoneration" program.

*Krasner's Corruption Act I*

*THE FIRST ACT*

*Philadelphia Police Officer Ryan Pownall*

75. On June 8, 2017, a few weeks after Krasner's victory in the Democratic primary, Philadelphia Police Officer Ryan Pownall ("Pownall") was involved in an Officer Involved Shooting ("OIS") that resulted in the death of David Jones ("Jones").

76. Jones was a convicted felon in possession of a firearm, who vigorously attempted to retrieve that firearm in an effort to shoot and kill Pownall.

77. Eyewitness accounts also stated Jones' posed a deadly threat to their safety.

78. Witness #3 confirmed this account to Pennsylvania Senior Deputy Attorney General Christopher Phillips, Investigator Richard Peffall, and Jacobs.

10

79.      Jones was convicted and sentence to two (2) years to six (6) years in prison in 2009 for possession with the intent to deliver narcotics ("PWID").

80.      Defendant **Michael Garmisa ("Garmisa")** represented Jones in the matter under criminal docket number CP-51-CR-0003557-2009.

81.      Judge Robert P. Coleman presided over the Jones matter.

82.      The day of the Pownall OIS incident, the only civilian eyewitness provided their account of the incident to Jacobs.

83.      Krasner obtained the contact information of that civilian witness and provided that information to Asa Khalif ("Khalif"), Christopher Norris, and Isaac Gardner, self-proclaimed members of Black Lives Matter ("BLM"). *Shown below with Krasner*



The Court authored:

> Second, it is undisputed that during the podcast Jacobs, among other statements, accused Tripp of being a criminal and the Philadelphia District Attorney's Office of operating "almost like a criminal enterprise." There is no evidence in the record that Jacobs's comments regarding corruption in the District Attorney's Office had any basis in fact.[3] Nor did he have any basis for his claims that the District Attorney's Office was conspiring with or improperly influenced by the Black Lives Matter movement.

*Jacobs v City of Philadelphia (19-cv-4616) Document 186, page 27.*

84.      Krasner used the BLM members as a conduit to intimidate/bribe the civilian witnesses, in particular witness #3, for their/his subsequent perjured testimony. Krasner also used BLM as interference in an ongoing investigation.

85.    As a result of Krasner's nefarious witness tampering actions of providing witness information in an ongoing investigation, Christopher Norris ("Norris") contacted Jacobs. Norris initially lied to Jacobs by claiming to be a witness to the Pownall OIS and he had received Jacobs information from then Philadelphia Police Commissioner Richard Ross.



*Chris Norris contacting Jacobs twelve days after Pownall OIS. Jacobs was not the assigned Detective. The "only" person with knowledge of Jacobs' participation outside of the PPD was Terrance Freeman shown below with Christopher Norris.*

86.    After Jacobs confronted Norris with his lies, Norris admitted receiving witness #3's information from Krasner. Norris then stated he received Jacobs' information from witness #3, Terrance Freeman.



*Norris and Freeman during an NBC Philadelphia television interview*

87.    Witness #3 then began to attend protests and media events with BLM.



*Asa Khalif and Isaac Gardner stormed a news conference, confronting City Council President Darryl Clark (shown above) regarding the Pownall OIS. Note: Jeremy Gradwohl worked in Council President Clark's Office.*

88.    On November 3, 2017, a civilian witness (witness #3), Jacobs, Pennsylvania Senior Deputy Attorney General Christopher Phillips ("Phillips"), and investigator Richard Peffall held a meeting at the Attorney General's Office.

89.    Phillips and the civilian witness confirmed the witness account provided to Jacobs was true and correct, line by line.

90.    The civilian witness relayed what happened during the meeting to BLM (Asa Khalif, Christopher Norris, and Isaac Gardner).

91.    Asa Khalif's lawyer (Lawrence Krasner) instructed Khalif to protest at the AGO where the meeting was held.

92.    Khalif followed Krasner's instructions and stormed the AGO shouting "somebody should kill the Attorney General" (Josh Shapiro) and "maybe we should kill the Attorney General."

arrested soon. When he was on his knees, the gentleman under arrest was on a rampage and said "somebody should kill the Attorney General" and "maybe we should kill the attorney general." He said we were all liars and racists and that they wanted action now.

93.    Khalif, also known as Earl Pittman, was arrested on location.

94.

**Philadelphia Police Department Arrest Report**                    Page 1 of 2 _PARS_

| Defendant: last name: **PITTMAN** | | Sex: **Male** | SSN: **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** | DOB: **10/23/1970** |
|---|---|---|---|---|
| first name: **EARL** | middle initial: | Race: **Black** | | Birth Place: **Philadelphia** |

| Home Phone #:215-000-0000 | Cell Phone#:  -  - | | Cell Phone Carrier: | |
|---|---|---|---|---|
| Email Address: | | | Social Media Address: | |

| Year: **2017** | District: **06** | DC#: **17-06-049396** | PSA: **2** | Ctrl#: **09867** |
|---|---|---|---|---|
| PID: **1179859** | | OTN: **U1021580** | Event: **171328439** | CBN: **1510576** |
| Crime Class: **1409** | Desc: **Vandalism/criminal mischief private property under $500** | | Authority: **Philadelphia Police Department** | |
| DFJ: **N** | | | FBI / FID: | |

Arrest Name: EARL PITTMAN                    DOB: 10/23/1970        SSN:

Address given to PPD:

**ARREST INFORMATION:**

Date / Time: 11/13/2017 11:45AM    District: 06  Inside/Outside: I    Arrest Type: **SA**    VIDEO:

21 S 12TH ST APT/Suite: 2ND Philadelphia PA 19107-

95.    Although the incident occurred at the Pennsylvania Attorney General's Office, Krasner's District Attorney's Office handled the prosecution of Earl Pittman aka Asa Khalif ("Khalif").

96.    Khalif was represented by Krasner's close ally and colleague Paul Hetznecker.

97.    Khalif's charges did not include the required felony charge of criminal trespass. Khalif was charged with defiant trespass, a lesser charge.

98.    Upon information and belief, a "back room" deal was struck between Krasner and Khalif's "counsel" to provide Khalif with Accelerated Rehabilitation Diversion ("ARD").

99. On March 2, 2018 the Philadelphia District Attorney's Office had to conflict out of the Khalif matter because Philadelphia District Attorney Lawrence Krasner had represented Khalif. _Note: Krasner also conspired with Khalif (BLM) to commit the alleged crime._

100.    Approximately one month later Khalif was granted ARD.

101.    One day after his inauguration (January 2, 2018) Krasner and "his" DAO retrieved the already adjudicated Pownall OIS from the AGO prior to its publication and/or public announcement by the AGO.

102.    SDAG Christopher Phillips, Assistant District Attorneys ("ADA") in the Homicide Division, and Special Investigations Unit of the District Attorney's Office all vehemently opposed Krasner's actions.

14

103.    Assistant District Attorneys, especially in the Special Investigation and Homicide Units began to flee Krasner's DAO for fear of being implicated in his criminal activity.

104.    On that same date Krasner requested that Deputy Philadelphia Police Commissioner Dennis Wilson remove Jacobs and his partner from the Officer Involved Shooting Investigation Unit ("OISI").

105.    It was later learned the removal request was because of their race (Jacobs is black and his partner is Latino). Patricia Cummings and Tracy Tripp subsequently made the racially charged comments to Jacobs' superiors.

106.    Jacobs and his partner were the only minorities assigned to OISI at the time of Krasner's request.

107.    In May of 2018 Tracy Tripp contacted Detective Brian Newell (the assigned Detective in the Pownall OIS) and Jacobs to be sworn into the Pownall grand jury as investigators.

108.    On August 2, 2018 Tripp contacted Jacobs and wanted him to adopt witness #3's solicited perjured grand jury testimony.

109.    Jacobs refused.

110.    Jacobs asked Tripp had witness #3 testified. Tripp responded she could not tell Jacobs that (this was the first indication to Jacobs that Tripp had zero knowledge of the Pennsylvania investigative grand jury process).

111.    Jacobs informed Tripp that Senior Deputy Attorney General Christopher Phillips ("Phillips") had already told him the Pownall OIS was adjudicated and no charges were going to be brought against Pownall.

112.    Tripp asked Jacobs if Phillips or the investigator made the statement.

113.    Jacobs told Tripp Phillips had made the statement.

114.    Jacobs realized the DAO criminal persecution being perpetrated against Pownall and told Tripp he was going on vacation and to contact the AGO and Phillips.

115.    In August 2018 the Inspector for OISI and the Detective Bureau, James Smith, held a meeting with Tracy Tripp and Patricia Cummings regarding the Pownall persecution.

116.    During the meeting Inspector Smith learned Hendershot was the ONLY member of OISI participating in the Pownall persecution.

15

117.    Inspector Smith also learned Hendershot was not reporting his contact with the DAO to his superiors as departmental policy requires.

118.    During the meeting Cummings and Tripp also informed Inspector Smith the DAO wanted Detectives Sierra and Jacobs removed from OISI because of their race.

119.    Inspector Smith refused Cummings and Tripp's requests.

120.    After the meeting Inspector Smith immediately went to OISI headquarters, irate, and confronted Hendershot in the presence of OISI members regarding his known nefarious activities in the Pownall persecution.

121.    Inspector Smith then went to Police Headquarters and informed Deputy Police Commissioner Dennis Wilson ("Wilson") of the Tripp's and Cummings' request to remove Jacobs and his partner because of the race,

122.    Inspector Smith also informed Wilson of the illegal prosecution of Pownall by the DAO.

123.    Soon after, on orders from Krasner, Wilson transferred the entire OISI Detective Bureau Command structure, with the exception of Hendershot.

124.    This created a ripple effect through the Detective Bureau.

125.    Wilson replaced the Command Structure with Chief Inspector Frank Vanore ("Vanore") and Inspector Benjamin Naish ("Naish").

126.    Since Vanore and Naish did not like or trust each other, Hendershot reported directly to Vanore, bypassing Naish but informing him.

127.    On September 4, 2018 Krasner and Tripp held a gleeful press conference to announce the return of the grand jury Presentment used to indict former Philadelphia Police Officer Ryan Pownall.

128.    On September 13, 2018, in an effort to cover up their criminal activity during the investigating grand jury, the DAO filed a "bypass" motion to deny Pownall a preliminary hearing.

129.    On September 19, 2018, Judge Patrick Dugan sent the case back to Judge Robert Coleman to adjudicate the DAO bypass motion on September 27, 2018.

130.    Judge Patrick Dugan scheduled Pownall's preliminary hearing for October 2, 2018.

131.    After returning from vacation Jacobs reviewed the "Presentment" publicized by Krasner and Tripp during their September 4, 2018 press conference.

16

132.    Jacobs later learned, in violation of grand jury secrecy, the Philadelphia District Attorney Lawrence Krasner provided Asa Khalif with the contents of grand jury deliberations prior to the Presentment on September 4, 2018.




Asa khalif @AsaKhalif · 9/1/18

According to several of my sources..former Police officer Ryan Pownall who murdered David Jones will turn himself in on Tuesday. It's about time he was arrested. #Justice4DavidJones #BlackLivesMatter

Warning ! He is considered armed and dangerous. He has killed and will kill again. Help Bring Him To Justice For David Jones

*The only "source" Khalif had was Krasner!*

133.    Jacobs viewed the Presentment and learned the DAO, including Krasner, committed criminal acts by soliciting perjury from witness #3 and witness #6 to illegally indict Pownall.

134.    After reviewing the criminal actions committed by the DAO, Jacobs immediately notified his Commanding Officer Jason Hendershot and showed him the perjury committed by witness #3 and witness #6 along with other "discrepancies" in the DAO Presentment,

135.    The assigned Detective also provided Hendershot with a "marked-up" version of the Presentment highlighting the "discrepancies" in the document versus the OISI investigation.

136.    On September 27, 2018, Jacobs was in courtroom 1007 managing a homicide trial, which he was the assigned investigator.

137.    On September 27, 2018, Tripp was in courtroom 1005 trying to cover-up the solicited perjury and illegal actions used to indict Pownall during a bypass motion.

138.    On September 27, 2018 Jacobs observed a Fraternal Order of Police ("FOP") attorney on the 10th floor of the courthouse.

17

139.    Jacobs held a brief consultation with the FOP attorney regarding the corruption and criminality at the DAO under Krasner.

140.    The FOP attorney was in the courthouse representing and attempting to protect Pownall from Krasner, Tripp, and the DAO nefarious activities.

141.    Tripp observed the consultation Jacobs was having with the FOP attorney from an unknown hidden perch and feared Jacobs was exposing the DAO criminal actions in the persecution of Pownall.

142.    On September 27, 2018 Judge Robert Coleman held the DAO request for a bypass motion under advisement.

143.    Jowandaly Graham was the court stenographer for the September 27, 2018 bypass motion hearing.

144.    On October 11, 2018, Judge Robert Coleman granted the DAO bypass motion request.

145.    Jowandaly Graham was the court stenographer for the October 11, 2018 hearing.

146.    On November 25, 2019, the DAO continued their attempts to cover-up their criminal activity by admitting they never informed the grand jury of § 508 by filing a Motion *in Limini* to preclude the Court from issuing a jury instruction of the Use of Force under Section 508.

147.    On **November 25, 2019**, Pownall's attorneys filed a Motion seeking the transcripts and materials from the grand jury.

148.    On **December 11, 2019**. The motion was granted.

149.    On **December 12, 2019,** the materials were delivered to Pownall's attorneys.

150.    Within one week of receiving the materials from the grand jury (**December 18, 2019**), Pownall's attorneys filed a Motion to Quash the Presentment and Dismiss all charges against Pownall.

151.    Prior to Judge Barbara McDermott ruling on the Pownall's Motion to Quash, the DAO demanded Judge McDermott rule of their Motion in Limini, which was DENIED.

152.    On December 31, 2019, the DAO filed and interlocutory appeal certifying the denial "**terminated, or substantially handicapped**" the prosecution (persecution) of Pownall.

153.	On September 20, 2020, the Pennsylvania Superior Court agreed with Judge Barbara McDermott and DENIED the DAO appeal.

154.	On July 20, 2022, the Pennsylvania Supreme Court also agreed with Judge Barbara McDermott.

155.	The Pennsylvania Supreme Court address the persecution of Pownall further with Justice Kevin Dougherty issuing a rare Concurring Opinion address to his concerns.

156.	Justice Dougherty stated "a special concurrence is unusual. But so is the Philadelphia District Attorney's Office's ("DAO") prosecution in this case."

157.	Justice Dougherty went further.

158.	Justice Dougherty addressed the following concerns in his Concurring Opinion:

    a.	…, here I cannot say the DAO treated Pownall "fairly and equally."

    b.	Pownall's Motion to Quash alleged the following: The DAO intentionally failed to notify the [g]rand [Jury of the [peace officer justification defense under 18 Pa. C.S. §508], well knowing that to do so would have prevented the grand jury from recommending criminal charges. However, the misconduct did not end there. The prosecution then asked the grand jury to return a presentment on homicide charges which included murder, voluntary manslaughter, and involuntary manslaughter, without defining any of those charges. This grand jury had no idea that they would have to have found from the evidence that Pownall acted with **premeditation** for murder of the first degree, **malice** for any form of murder, **a mistaken belief in self-defense** for voluntary manslaughter, or **criminal recklessness** for involuntary manslaughter. This may be [the] first time in the history of Pennsylvania jurisprudence that a District Attorney requested a grand jury to authorize criminal charges without explaining the law that applies to those charges because to do so would have prevented a finding of probable cause. Justice Dougherty response was the following: "***In my view, if these allegations are true as they "appear to be," it implicates a "potential abuse" of the grand jury process.***"

    c.	"… it is disturbing that the DAO went to "such lengths" to deprive Pownall of his statutory right to a preliminary hearing."

    d.	"… a preliminary hearing would have exposed the DAO "**questionable means**" of obtaining the grand jury presentment."

    e.	"The DAO secured from the grand jury, which operates under the cover of secrecy, a slanted presentment written by the DAO's own attorneys, based on its preferred facts."

f. "Little that has happened in this case up to this point reflects procedural Justice. On the contrary, the DAO's prosecution of Pownall appears to be "driven by a win-at-all-cost office culture" **that treats police officers differently than other criminal defendants."**

g. "This is the "antithesis" of what the law expects from a prosecutor."

159.    Justice Dougherty observed these findings without the knowledge/argument of the DAO solicitation of perjury in furtherance of their criminal activity.

160.    After the Pennsylvania Supreme Court ruling, Judge Barbara McDermott held oral arguments on October 11, 2022.

161.    After oral arguments Judge McDermott authored a Statement of Findings of Fact and Conclusion of Law on October 17, 2022.

162.    Judge McDermott authored the following concerns regarding the prosecution/persecution of Pownall:

a. The Commonwealth made an intentional, deliberate choice not to inform the grand jurors about the justification defense under Section 508.

b. A prosecutor has a duty to be fair to the accused and candid to the courts. Prosecutors cannot provide an inaccurate and misleading statement of the law to the tribunal.

```
    9.    Between September 4th and 27th, 2018 Jacobs
reviewed the grand jury presentment pertaining to
Officer Pownall.

    10. After review of the presentment, Jacobs
learned the Assistant District Attorney, Tracy
Tripp had committed illegal acts.

    11. Jacobs learned that Tripp knowingly and
intentionally presented false, misleading and
perjured testimony to the grand jury, which
resulted in the indictment of Officer Pownall.

    12. On September 27, 2018 Jacobs spoke with an
attorney to explore his option of reporting Tripp's
corruption and criminality.
```

*Jacobs v City of Philadelphia (19-cv-4616) Doc. #29 at 9-12*

c. The Commonwealth committed multiple errors throughout the Grand Jury process that prejudiced the Defendant.

20

    d.   The Defendant's due process rights under the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution were violated by the Commonwealth.

    e.   The Commonwealth demonstrated a "lack of candor" to the Court

    f.   The Commonwealth was also "disingenuous" with the Court

    g.   For the foregoing reasons, … all charges are DISMISSED.

163.    Judge McDermott observed these findings without the knowledge/argument of the DAO solicitation of perjury in furtherance of their criminal activity.

164.    After Judge McDermott's DISMISSAL of all charges against Pownall as a result of the DAO's nefarious activities, Krasner and his corrupt DAO only recourse was for The Philadelphia Police Department to conduct a fabricated investigation and author an illegal affidavit/warrant to arrest Pownall.

165.    Krasner, Philadelphia Police Commissioner Danielle Outlaw, and Deputy Philadelphia Police Commissioner Frank Vanore held a meeting and originally tasked OISI with the investigation.

166.    This is the same unit Jacobs was assigned when he observed the DAO illegally arrest Pownall.

167.    Jacobs has always maintained after reviewing the grand jury Presentment of Police Officer Ryan Pownall, he deduced, based upon twenty years of experience and the factual knowledge he possessed on the investigation, that only false, misleading and perjured testimony was presented to the grand jury in order to obtain an indictment against Police Officer Ryan Pownall ( Jacobs v City of Philadelphia 19-cv-4616, *Doc. 14 and 29).*

168.    On October 26, 2022, Lieutenant Hendershot and the assigned investigator, Detective Brian Newell, met with Assistant District Attorneys ("ADA") Brian Collins, Vincent Corrigan, and Lyandra Retacco, at Krasner's request.

169.    The purpose of the meeting was to discuss a review of the Pownall OIS after Judge McDermott's DISMISSAL.

170.    OISI "review" of the investigation into the Pownall OIS produced facts THE SAME FACTS. There was "never" any probable cause to arrest Pownall.

171.    On or about November 2022 Lieutenant Hendershot prepared an "Affidavit of Facts" indicating OISI findings and submitted the affidavit up the "chain of command" and supplied Krasner and the DAO a copy of the affidavit.

21

**AFFIDAVIT OF FACTS: PS17-17**

I am Lieutenant Jason Hendershot #148 and I have been a Philadelphia Police Officer for more than twenty-five (25) years. I am the Commanding Officer of the OISI Unit and I have been assigned to the OISI Unit for over four (4) years. During the past four (4) years, I have directed and supervised of over seventy-five (75) OIS incidents.

Prior to being assigned to the OISI Unit, I was assigned to the Internal Affairs Division (IAD) Shooting Team for eighteen (18) months as an OIS investigator and was the primary investigator on twelve (12) OIS incidents. In addition, I participated in over twenty-five (25) OIS incidents with my team at IAD.

At some point, prior to September 4, 2018, I met with ADA Tracy Tripp to discuss matters relating to the Officer-Involved Shooting involving discharging Police Officer Ryan Pownall, who shot and killed a male named David JONES. ADA Tripp advised me of the facts gleaned during a Grand Jury investigation of this matter and that DAO utilized the Twenty-Ninth County Investigating Grand Jury, which issued Presentment #4 under Notice C-55. That Presentment set forth the basis of the probable cause supporting the issuance of an arrest warrant for Officer Pownall. Acting in Good Faith, based exclusively upon the materials in the Presentment as represented by ADA Tripp, I submitted an Affidavit of Probable Cause and obtained an arrest warrant for Police Officer Pownall.

From 2018 through October of 2022, there have been numerous court-related motions and rulings. The Honorable Barbara A. McDermott issued a Statement of Findings and Conclusions of Law, dated October 17, 2022. Judge McDermott ruled that the Commonwealth's case relied *exclusively* on the Presentment. Due to procedural errors, Judge McDermott ruled that Ryan Pownall's Constitutional Rights were violated and GRANTED Officer Pownall's Motion to Quash and dismissed all charges.

On October 26, 2022,                               the assigned investigator for this police shooting – and I met with ADA Brian Collins, ADA Vincent Corrigan and ADA Lyandra Retacco at the DAO. Based upon conversations with ADAs Collins, Corrigan and Retacco, the DAO requested that OISI Unit review all of the facts gathered during the investigation. In addition, OISI was directed to review evidence that was presented to the Investigating Grand Jury. The DAO further requested that OISI submit the facts of this investigation for review.

                          I reviewed the facts gathered during the course of the investigation conducted by the OISI Unit and reviewed facts gathered during the Grand Jury investigation. Listed below are the facts that OISI learned during the review of this case.

Based on a review of video evidence and Police Radio transmissions, the firearm was located approximately 2 minutes and 45 seconds after Officer Pownall fires the last shot.

I am likewise aware that the District Attorney's Office contracted with Gregory A. Warren, Ed.D. (American Law Enforcement Training and Consulting, LLC) who reviewed the facts of this case and rendered his expert opinion that Officer Pownall's use of deadly force was justified under Pennsylvania Law.

A thorough review of all evidence collected during the Officer Involved Shooting Investigation, interviews of witnesses, and analysis of video, leads us to believe that the aforementioned facts do not rise to the level of probable cause to recommend criminal charges against former Police Officer Ryan Pownall.

*Hendershot Affidavit of Facts*

22

172.    The report incensed Krasner and he called an immediate meeting with then Philadelphia Police Commissioner Danielle Outlaw and Deputy Police Commissioner of Investigations Frank Vanore.

173.    During the meeting Krasner, Outlaw, and Vanore conspired to engage in criminal activity and violate the Constitutional Rights of Pownall.

174.    Krasner, Outlaw, and Vanore acted in concert along with Deputy Police Commissioner Robin Wimberly to have Internal Affairs (Investigative Support Services ("ISS")) prepare an illegal arrest warrant to arrest Pownall.

175.    Krasner, Outlaw, Vanore, and Wimberly then, in violation of Philadelphia Police Department policy, ORDERED all of the Pownall OIS documents be transferred from OISI to ISS in furtherance of the criminal activity.

Is the former Police Officer Ryan Pownall's officer-involved shooting still under investigation by the Philadelphia Police Department?

ATTORNEY GONZALES:

I will let him answer that question.  He can answer that.

THE WITNESS:

To my knowledge, it's assigned to the Internal Affairs Division.

BY MR. JACOBS:

Q.    Why would an officer-involved shooting be assigned to the Internal Affairs Division?

ATTORNEY GONZALES:

I'm going to object and instruct him not to answer.

We're not getting into any details related to the investigation.  I let him

*Jason Hendershot deposition on September 28, 2023, page 32.*

23

176.    During this time, Pownall and his family began to receive information/threats he would be arrested around the holidays (Thanksgiving/Christmas).

177.    Krasner acknowledged his participation/complicity in the illegal activity against Pownall during a press conference on or about December 19, 2022 responding to a question from Ralph Cipriano of BigTrial.net.

178.    **Question by Ralph Cipriano**: … *Mr. Krasner, … I understand you've been having high level discussions with Police Commissioner Outlaw and several of her Deputies seeking an affidavit of probable cause in the Ryan Pownall case and I understand they are balking at issuing that. In light of the fact that the State Supreme Court has admonished you, alleging you "abused the grand jury process" in the trial… and thrown this bogus indictment out of court because it's riddled with legal errors, is it time to call an end to this prosecution.*

179.    **Answer by Lawrence Krasner**: *Which one of those several sentences has a question mark after it, sir.*

180.    **Question by Ralph Cipriano**: *Ryan Pownall, are you ready to hang it up on that….*

181.    **Answer by Lawrence Krasner**: *No, "we've" (conspiracy) made clear "we" intend to "follow through" with Mr. Pownall's case, as we should. That matter is actively "under investigation" as it should be and "we intend to fully follow through."*

182.    Krasner then fled the press conference (Flight is consciousness of guilt).

183.    This was approximately a full two months after Judge Barbara McDermott's DISMISSAL of all charges against Pownall and OISI "review" and report, which stated there was NEVER probable cause to arrest Pownall. *Note: Pownall has been reinstated to the PPD.*

184.    This was more than five years after the Pennsylvania Attorney General Office's determination there was not probable cause to arrest Pownall.

185.    Krasner acknowledged the criminal conspiracy with Outlaw, Vanore and Wimberly and others to prepare an illegal affidavit at the request of Krasner to arrest Pownall.

186.    After the press conference an incensed Krasner immediately contacted Outlaw and Vanore requesting the nature of the "leak" of information to Ralph Cipriano.

187.    Vanore then contacted Hendershot and threatened disciplinary action to any member of OISI who communicated with Jacobs, exposing their criminal activity.

188.    Vanore subsequently learned Jacobs had obtained a copy of the Affidavit of Facts that was disseminated throughout the Philadelphia Police Department and the Philadelphia District Attorney's Office.

189.    When Krasner learned of Jacobs' "acquisition" he became enraged that no one would now author HIS illegal affidavit to arrest Pownall.

190.    In 2018 Krasner began filming an eight-part docuseries titled Philly D.A.

191.    The series began airing in the Spring of 2021.

192.    Episode 7 was Titled "**You Prosecute Cops**."

193.    The episode focused on prosecuting/persecuting Ryan Pownall.

194.    In the episode, Jacobs' former Commanding Officer, Lieutenant Steve Nolan ("Lt. Nolan"), was interviewed.

195.    Lt. Nolan was/is an honest and fair Commanding Officer and person. The total opposite of his replacement, Lieutenant Hendershot.

196.    Lt. Nolan stated during the episode *"...the last twenty years of my career, I spent investigating just Police Involved Shootings, ...in this David Jones' case, I was the first supervisor on location and spoke with Officer Pownall, Officer Pownall walked me through the incident, it was a stressful event, while I was speaking to him at the scene, certainly he wasn't ecstatic that he had just had to employ deadly force... in viewing Officer Pownall's actions, if you weighed them against section 508 of the crimes code which "governs" an officer's use of force it appeared to me that Officer Pownall abided by those guidelines... what he's been charged with to me "doesn't fit the um crime"... he should be allowed to return to his prior position in the police department."*

197.    The Pennsylvania Attorney General, an Officer Involved Shooting expert of more than two decades, a decorated Detective, and THE LAW all said Pownall did not commit a crime.

198.    This was without addressing the PERJURY solicited by Krasner and HIS DAO.

199.    Krasner knew Lt. Nolan and OISI would not author his fabricated and illegal affidavit, so he waited for Lt. Nolan to retire and requested that Wilson INSERT Hendershot as the new Commanding Officer.

200.     This was a premediated plan to illegally charge Pownall with murder.

201.     Hendershot blamed his ignorance of Tripp and the DAO when they all were involved in the criminal conspiracy.

202.     Hendershot had Lt. Nolan, the OISI investigators, and the investigative documents ALL at his disposal. They ALL told and showed no probable cause to arrest Pownall.

203.     Hendershot knowingly, illegally, intentionally, and recklessly authored an illegal affidavit/criminal complaint to arrest Pownall.

204.     Hendershot did not inform any member of OISI he authored the illegal affidavit/criminal complaint, including the assigned investigator.

205.     With more egregious facts and showing his disdain for law enforcement officers, Krasner's DAO just *nolle pros* a case against a prominent black lawyer shooting at a victim running away.

*Krasner's Corruption Act II*

*Police Officer Eric Ruch*

206.     On December 11, 2017 Police Officer Eric Ruch was involved in an OIS.

207.     Assistant District Attorney ("ADA") Michael Bonner of the Philadelphia District Attorney's Office Special Investigations Unit ("SIU") was in charge of the investigation and decided no charges should be brought against Ruch.

208.     Once again, Krasner's "new" DAO misled an investigative grand jury in order to indict Ruch.

209.     ADA Bonner left the DAO after observing Krasner's new team of corrupt prosecutors, which included ADA Vincent Corrigan.

210.     ADA Bonner was not the only ADA to leave Krasner's DAO after observing his corruption "first hand" in his new "Special Investigations Unit" ("SIU").

211.     ADA Sybil Murphy, ADA Michael Bonner, ADA Jahlee Hatchett, ADA Ray Driscoll, and ADA Kathleen Lewis all fled Krasner's "criminal enterprise."

212.     Krasner's DAO goal is to get a law enforcement officer in front of a "Philadelphia" jury and withhold exculpatory evidence during trial to ensure a conviction.

213.    As in the Pownall investigating grand jury, Krasner also intentionally did not provide Ruch's investigating grand jury with section 508 of the Pennsylvania Crimes Code.

214.    Jacobs personally along with another Detective interviewed a witness (on video) that was present during the shooting and heard Ruch shouting commands that the decedent refused to comply with.

215.    Krasner intentionally did not provide exculpatory evidence.

216.    Krasner indicted Ruch after Charles Cassidy, from the same District as Ruch, was assassinated.

217.    Krasner indicted Ruch after John Pawlowski, from the same District as Ruch, was assassinated.

218.    ADA Vincent Corrigan withheld exculpatory evidence of Police Officer DelRicci, who was intentionally struck by the vehicle occupied by the decedent that traveled upwards of 70 mph.

219.    The vehicle and occupants were wanted in connection to a murder.

220.    The decedents' furtive movements led to the discharge as the position of his hands indicated.

221.    ADA Corrigan also "investigated" his own alternative facts and would not provide the nature of these "alternative facts" to OISI.

222.    ADA Corrigan withheld exculpatory evidence to indict Ruch.

*Krasner's Corruption Act III*

*Fire the Prosecutors*

223.    In January 2018 Lawrence Krasner entered office as the new District Attorney for the City of Philadelphia.

224.    Within hours of entering office Krasner began to implement his progressive and premeditated policies by targeting sworn law enforcement officers and prosecutors within his DAO for financial gain.

225.    Days after entering office (January 5, 2018), Krasner fired thirty-one (31) prosecutors from the DAO. Most of the prosecutors were from the DAO Homicide Division.

226.    These seasoned public servants were forced to vacate their offices during a major winter weather storm categorized as a "bomb cyclone."

227.    That was the respect Krasner showed lifelong public servants who placed victims over themselves.

228.    Jacobs knew and worked with most of the fired prosecutors.

229.    These targeted attacks on law enforcement officers and prosecutors were to advance Krasner's "**premeditated**" agenda of stealing millions of dollars from the citizens of Philadelphia.

230.    Krasner could not advance his PREMEDITATED plan of prosecutorial misconduct with the fired prosecutors still on the "inside."

231.    During a press interview Krasner stated "here's the bottom line, "coach" gets to pick the team."

232.    Krasner replaced the dedicated public servants with his "team," whom Judges and Justices alike authored opinions stating Krasner's TEAM "lacked candor." That term would be considered PERJURY if Krasner's "team" were sworn in.

233.    The opinions stated Krasner's TEAM was "disingenuous" to the Court.

234.    The opinions stated Krasner's TEAM violated the Constitutional Rights of law enforcement officers.

235.    The opinions stated Krasner's TEAM tampered, manipulated, and/or destroyed evidence.

236.    The opinions stated Krasner's TEAM treated law enforcement officers "differently" than other criminal defendants.

237.    It's ironic that during the interview with the press (CBS), Krasner cited diligence and "ethics" for firing the prosecutors.

238.    Before and after Krasner won the general election in 2017, Jacobs had multiple conversations with Edward "Ed" Cameron ("Cameron"), who was the Assistant Chief of the DAO Homicide Division.

239.    After Krasner won the general election, Krasner and his "transition team" began requesting numerous homicide case files.

240.    Krasner's transition team asked Cameron to obtain the files.

241.    The majority of the files were over ten years old and/or "targeted" Law Enforcement Officers and Prosecutors that Krasner disliked.

242.    Jacobs was one of the targeted Officers.

28

243. The prosecutors targeted were, but not limited to, Roger King, Judith Rubino, Carlos Vega, David Desiderio, Mark Gilson, Richard Sax, Bridget Kirn, and Beth McCaffery.

244. Krasner would later target and defame Cameron.

245. Cameron was complaining/discussing with Jacobs Krasner's "transition team" was asking him to obtain cases and when the files/cases were returned, evidence and documents were missing.

246. The DAO and Philadelphia Police Department now had numerous files intentionally corrupted.

247. One of the files returned with tampered evidence was Wesley Cook aka Mumia Abu Jamal's file as it related to the murder of Police Officer Daniel Faulkner.

248. The DAO ADAs knew what Krasner was doing, but all feared for their current and future employment.

249. Most just wanted to escape with their law license and dignity.

250. Only one ADA (former) challenged Krasner's DAO illegal activity. That ADA was former homicide ADA Beth McCaffery ("McCaffery").

251. McCaffery was not one of the fired ADAs.

252. McCaffery had previously retired.

253. McCaffery, however, was one of the ADAs defamed by Krasner and Cummings in their criminal conspiracy to pilfer millions from the City of Philadelphia.

254. It has now been unequivocally proven, with a COURT RECORD, Krasner, Cummings, and Krasner's DAO "intentionally" lied to the Court in an effort to release a CONVICTED MURDERER and obtain millions of dollars from the citizens of the City of Philadelphia.

255. When Cummings was caught in her criminal activity she ran, hid, and refused to testify to her criminality.

256. One courageous retired Assistant District Attorney (Beth McCaffery) exposed Krasner's criminal enterprise and with one case exposed his entire pattern and practice of corruption for cash.

257. Krasner and Cummings released numerous convicted murderers with this pattern and practice, at a cost of tens of millions of taxpayer dollars. *Note:*

29

*Litigation, settlements, and cost are well over a hundred million dollars and counting. The citizens are being fleeced by Krasner's corruption.*

258.     This has also cost City of Philadelphia taxpayer lives, as some of the illegally released murderers have gone onto allegedly MURDER again.

259.     After Krasner's inauguration and the firing of the prosecutors, Jacobs and Cameron had additional conversations in Cameron's office.

260.     Cameron was distressed about his future at the DAO.

261.     Cameron was distressed about the destruction and tampering with evidence of the homicide case files by Krasner.

262.     Cameron was distressed that former friends and colleagues were being illegally targeted by Krasner for financial and personal gain.

263.     Cameron's appearance was something that Jacobs had never observed, as the stress was obvious.

264.     Cameron and Jacobs conversation extended to a conference room outside of Cameron's office where ADAs and Detectives met to discuss cases.

265.     The conference room was dedicated to former prosecutor Roger King, who Krasner despised.

266.     The conference room was destroyed. The monitor was ripped off the wall, there was damage to the walls. The room was destroyed.

267.     Cameron stated Krasner destroyed the room because he hated Roger King.

268.     This is the same hatred and violence Krasner inflicted on the careers of lifelong prosecutors and law enforcement officers.

269.     This also sent a clear message to the prosecutors that remained, according to Cameron.

*Krasner's Corruption Act IV*

*Stefon Crawley*

270.     On January 12, 2018 Mensah Dean of the Philadelphia Inquirer published an interview with Krasner.

271.     During the interview Krasner stated lack of charges in police shootings "**this ain't fair, this is BIAS**." *Note: Krasner had been District Attorney less than two weeks.*

30

272.     On January 13, 2018 Stefon Crawley decided to celebrate the Philadelphia Eagles earlier playoff win by killing multiple Philadelphia Police Officers.

273.     Stefon Crawley was shot during his quest and immediately arrested.

274.     Jacobs was the assigned investigator of the January 13, 2018 OIS involving Crawley.

275.     Crawley was subsequently represented by Krasner's former law firm (Greenblatt, Pierce).

276.     On or about February 11, 2019, Krasner's DAO, including Tripp and ADA Brian Collins, "withdrew" the charges against Crawley. ADA Kathleen Lewis stated the withdrawal was illegal and said she could not speak about the case any longer without consulting with an attorney.

277.     Krasner's DAO intentionally did not clear the involved Officers of criminal prosecution so they could withdraw the charges against Crawley and provide him and Krasner's former firm with a payday.

278.     Krasner's DAO arrested one of the police officers (Jason Reid) involved in the OIS to tarnish his reputation in furtherance of this criminal activity.

279.     On December 11, 2019, ADA Brian Collins ("Collins") wanted information from the OIS involving Crawley.

280.     This was TEN (10) months after Krasner's DAO illegally withdrew charges against an attempted murderer for financial gain.

281.     This criminal tried to kill multiple police officers with an illegal firearm loaded with an extended magazine.

282.     Collins' indicated he knew Jacobs was the assigned investigator but wanted the information from someone other than Jacobs.

283.     On that same date (December 11, 2019) Samantha Melamed of the Philadelphia Inquirer authored an article smearing Jason Reid and misrepresenting the facts as they related to the OIS involving Crawley. *Note: Jacobs contacted Melamed inquiring who provided her the misinformation on his case and Melamed stated she did not remember.*

284.     On December 20, 2019, Krasner's former law firm filed a lawsuit against the Officers Crawley vigorously tried to murder.

285.     Crawley, with the "assistance" and representation of Krasner's former law firm, sued the City of Philadelphia, Officer Timothy Stephan, and Officer Jason Reid because the Officers stopped him from killing them.

31

286.　　Upon learning of Crawley's lawsuit, Jacobs immediately contacted the Officers' lawyer, John Gonzalez from the law firm Marshall Dennehey.

287.　　Jacobs informed Gonzalez he was the investigator assigned to the OIS involving Crawley.

288.　　Jacobs also informed Gonzalez he possessed evidence of Crawley's guilt and the Officers' innocence.

289.　　Gonzalez never contacted Jacobs as a witness and, in Jacobs' opinion, abdicated his fiduciary responsibility to Jacobs and the tax paying citizens of Philadelphia.

290.　　There was a fly in the ointment in Krasner's quest to steal the taxpayer's dollars to pay Crawley and his former law firm.

291.　　Krasner would have to clear Officers Timothy Stephan and Jason Reid from criminal prosecution.

292.　　This would allow the Officers to testify in a deposition regarding Crawley's lawsuit.

293.　　On May 28, 2021, Tracy Tripp, Krasner's Special Investigation Unit's supervisor, requested and received a memorandum stating the Officers would not be criminally charged.

294.　　There were no changes in the investigation between February 11, 2019 and May 28, 2021 other than to get Crawley and Krasner's former law firm paid with taxpayer dollars.

295.　　The Officers were cleared prior to the statute of limitations expiring, but Krasner's DAO refused to re-arrest Crawley, showing their complicity of rewarding an attempted murderer of Philadelphia Police Officers.

296.　　Crawley was paid $225K for attempted murder of Philadelphia Police Officers.

STEFON CRAWLEY
c/o James A Funt, Esquire
Greenblatt, Pierce, Funt and Flores, LLC
123 S. Broad Street
Philadelphia, PA 19102

In Reply Please Refer To:
File No. 104113
Date:  January 31, 2022
Payable within 45 days
after receipt of the executed
Release & W-9 form

**The lower portion of this form is a release.  Please read it carefully before signing.**

**STEFON CRAWLEY**
v.
**CITY OF PHILADELPHIA, et al.**
PCCP December Term 2019, No. 3131

For and in consideration of the sum of Two Hundred Twenty-Five Thousand Dollars, ($225,000.00), I, **STEFON CRAWLEY**, do hereby remise, release and forever discharge the City of Philadelphia, its agents, servants, workers or employees, and any and all other persons, associations or organizations, whether known or unknown, foreseen or unforeseen, of all actual and/or potential liability accrued and hereafter to accrue on account of and from all, and all manner of, actions and causes of action, claims and demands whatsoever, either in law or equity, especially a claim for injuries and/or damages sustained on or about January 13, 2018 at or around the ▓▓▓ ▓▓▓▓▓ Philadelphia, Pennsylvania which against the City of Philadelphia,

297.     This criminal conspiracy was orchestrated by Philadelphia District Attorney Lawrence Krasner as the policymaker for the City of Philadelphia.

*Krasner's Corruption Act V*

*Jacobs*

298.     Immediately after being sworn in (January 1, 2018), Krasner contacted Deputy Police Commissioner Dennis Wilson requesting that Jacobs and his partner (William Sierra) be transferred from the Officer Involved Shooting Investigation Unit ("OISI").

299.     Krasner's "reason," Sierra was a member of the Fraternal Order of Police ("FOP"), and his race.

300.     When that failed, Krasner decided to make Sierra and Jacobs corrupt Detectives, his modus operandi against honorable law enforcement officers.

33

301.    Krasner's DAO attempted to accuse the Detectives of coercing a confession (pattern and practice of Krasner's DAO) of a person who shot and killed his four-year old daughter by shooting her in the head while she was watching cartoons (SpongeBob).

302.    The defendant then assaulted his five-year old daughter and wiped the decedent's blood on her clothing.

303.    The defendant told his thirteen year old daughter to tell police the five-year old killed the four-year old, as he fled from the location.

304.    The defendant, Maurice Phillips, then confessed to the murder of his four-year old daughter.

305.    Detective Sierra was the assigned investigator.

306.    Between January 2018 and May 2018, Krasner's DAO and his Chief of Homicide, Anthony Voci, attempted to solicit perjury from Phillips to say the Detectives (Sierra and Jacobs) coerced his confession.

307.    Krasner's pattern and practice is to accuse prosecutors and law enforcement officers of criminal activity (coercion, misconduct) and release murderers for profit upon society.

308.    The accusations are fabricated by Krasner's DAO.

309.    In the Maurice Phillips' case, Voci was heard stating the Phillips confession is airtight and Krasner's DAO could not get Sierra and Jacobs.

310.    Jacobs has personally observed Voci in homicide courtrooms attempting to have cases dismissed.

311.    After one attempt, Voci exited the courtroom upset and verbally assaulted a decorated officer (TE) and his rookie partner for just talking in the ante room.

312.    On September 27, 2018 Jacobs observed a Fraternal Order of Police ("FOP") attorney on the 10th floor of the courthouse.

313.    As a result of the aforementioned actions of Krasner's DAO, Jacobs sought legal advice on how to proceed from "HIS" FOP counsel.

314.    Jacobs held a brief consultation with the HIS FOP attorney regarding the **"corruption and criminality"** at the DAO under Krasner.

315.    The FOP attorney was in the courthouse representing and attempting to protect Pownall from Krasner, Tripp, and the DAO nefarious activities.

316.    Tripp observed the consultation from an unknown hidden perch and feared Jacobs was exposing the DAO criminal persecution of Pownall.

317.    Tripp reported Jacobs' consultation with the FOP attorney to Krasner, Patricia Cummings and others.

318.    Krasner ordered Tripp to contact Jacobs' Commanding Officer and ascertain the nature of Jacobs' privileged communications with the FOP attorney.

319.    Tripp followed Krasner's orders and contacted Jacobs' Commanding Officer, Jason Hendershot ("Hendershot").

320.    Hendershot contacted Jacobs and informed him Tripp threatened anyone in OISI for communicating with an FOP attorney.

321.    Jacobs informed Hendershot there is no need to threaten other members of OISI.

322.    Jacobs informed Hendershot he was consulting with the FOP attorney regarding the corruption and criminality at the DAO.

323.    Hendershot relayed Jacobs' comments back to Tripp, who in turn relayed them to Krasner and Cummings.

324.    On October 16, 2018, Jacobs and his partner received a court notice for October 18, 2018.

325.    Based upon the comment section of the court notice, on October 16, 2018, Jacobs contacted Tripp by email and asked if the notice was "sent in error."

326.    Tripp responded by email, stating the court notice was not sent in error and there is "some additional "investigation" required at this time."

327.    After Tripp's response, Jacobs and Sierra asked Hendershot the nature of Tripp's obvious nefarious actions.

328.    Hendershot indicated he did not know what Tripp's intentions were.

329.    On October 18, 2018, Jacobs, Sierra, and Hendershot attended the court proceeding.

330.    When Tripp observed Hendershot, she pulled him aside and engaged in a conversation.

331.    Hendershot returned and informed Jacobs and Sierra, Tripp asked him why was he at the court proceeding.

332.    Then Hendershot informed Jacobs and Sierra Tripp was "investigating" the partners for a grand jury leak in the Pownall matter.

333. Both Jacobs and Sierra did not participate in the grand jury, other than being sworn in as investigators/law enforcement officers.

334. When the conflict-of-interest FOP attorney (Greg Pagano) arrived, he informed Jacobs and Sierra the proceeding would have to be continued.

335. The proceeding was continued to November 9, 2018.

336. On November 9, 2018, attorney Greg Pagano viewed the transcripts from the September 27, 2018 bypass hearing in the presence of Jacobs and Sierra.

337. Pagano informed Jacobs and Sierra of Tripp's criminal activity.

338. Jacobs and Sierra immediately told Pagano they wanted criminal charges brought against Tripp and a civil lawsuit filed.

339. Tripp threatened to arrest Jacobs for criminal contempt.

340. Pagano informed Jacobs Tripp told him she wanted Jacobs silent until after the Pownall trial.

341. In May 2019, Hendershot informed Jacobs and Sierra Tripp would be withdrawing the charges because the transcripts were lost.

342. On August 1, 2019, Jacobs was sworn into an investigative grand jury for a case involved an alleged serial killer.

343. Jacobs provided the first investigative information leading to the arrest of the serial killer.

344. Tripp was present during the swearing in process.

345. After Jacobs was sworn in, Tripp chased Jacobs down (literally) before he could get on the elevator.

346. Tripp repeatedly (nauseating) informed Jacobs she would be withdrawing the criminal contempt charges against him.

347. Tripp stated she previously informed Jacobs' Commanding Officer (Hendershot).

348. Tripp also stated she did not think Jacobs' conflict of interest attorney, Greg Pagano, would object.

349. On October 4, 2019 Jacobs filed a lawsuit (19-cv-4616).

350. Federal District Court Judge Harvey Bartle III was given the judicial assignment.

351.    During depositions relating to the lawsuit, Jacobs received confirmation of Defendants' retaliation as a result of his reporting of corruption.

352.    Jacobs Commanding Officer, Lieutenant Jason Hendershot, testified in his deposition that he told his superiors Krasner's DAO fabricated the grand jury leak story against Jacobs and his partner.

353.    The grand jury leak fabrication was because Jacobs was exposing wide spread corruption and criminality at Krasner's DAO.

354.    Hendershot further testified, in furtherance of their criminal conspiracy, his superiors (Deputy Police Commissioner Wilson) ordered him to spy on Jacobs and report the information back to Krasner through his attorney Kia Ghee (now Common Pleas Court Judge).

355.    Hendershot followed the illegal and invasive orders and spied on Jacobs.

356.    On January 18, 2020, Jacobs discussed his ongoing litigation (19-cv-4616) on a podcast.

357.    Jacobs, as was his practice, informed Hendershot of his participation before (January 17, 2020) and after the podcast (January 20, 2020).

358.    Hendershot immediately followed Wilson's (and Krasner's) orders to spy on Jacobs and reported the information back to Krasner through Kia Ghee.

359.    Krasner immediately contacted Deputy Police Commissioner Dennis Wilson and told him to terminate Jacobs because he was exposing corruption at the DAO.

360.    Wilson contacted Vanore and Hendershot and ordered them to charge Jacobs with Conduct Unbecoming an Officer without ever hearing the podcast or its contents (January 21, 2020).

361.    This was before Krasner, Ghee, Wilson, Vanore, and/or Hendershot heard what Jacobs said on the podcast because it was a recording that was not made public.

362.    Ghee informed Hendershot to obtain information from Jacobs he violated departmental policy during Hendershot's disciplinary interview with Jacobs.

363.    The defendants then fabricated, once again, Jacobs exposed confidential information.

364.    Once again, Hendershot testified during his deposition "HE WAS WRONG." Jacobs did not expose confidential information.

365.     Once again, the defendants fabricated a story in retaliation against Jacobs for reporting corruption.

*Krasner's Corruption Act VI*

*Target Law Enforcement Officers*

**SWAT Police Officer Richard Nicoletti**

366.     On August 20, 2018 an Officer Involved Shooting occurred in the area of 7100 Hegermann Street involving Jeffrey Dennis who was shot and killed.

367.     The discharging Officer was Richard Nicoletti who was assigned to the Narcotics Field Unit ("NFU"),

368.     During the investigation it was revealed that Lawrence Krasner represented Jeffrey Dennis while he was a defense attorney, which presented a conflict of interest for the DAO.

369.     The case was assigned to the Pennsylvania Attorney General's Office as a result.

370.     This angered Krasner, who wanted public outcry and enlisted his confidant/henchman, Asa Khalif, to achieve that desired goal.



*Asa Khalif protesting the OIS of Krasner's former client Jeffrey Dennis with a bullhorn.*

371.     The Pennsylvania Attorney General's Office cleared Officer Richard Nicoletti from NFU of any wrongdoing in the OIS involving Krasner's former client.

372.     This incensed Krasner.

38

373.    On June 1, 2020, Philadelphia Police Officer Richard Nicoletti ("Nicoletti"), assigned to the Special Weapons and Tactical ("SWAT") Unit was tasked by his superiors with clearing I-676 Expressway of RIOTERS, who had conspired and destroyed a Pennsylvania State Police vehicle along with various other criminal actions.

374.    Krasner believing this was the same Officer Richard Nicoletti that killed his friend and former client, retaliated.

375.    Krasner created a criminal conspiracy with former Philadelphia Police Commissioner Danielle Outlaw, Deputy Police Commissioner Dennis Wilson ("Wilson"), Deputy Police Commissioner Robin Wimberly, and others to illegally arrest Officer Richard Nicoletti assigned to SWAT.

376.    Wilson was threatened with arrest and bribed with losing his Deferred Retirement Option Plan ("DROP") money estimated at 800k.

377.    Wilson told others it was "easier" to lie and make the public statement leading to the arrest of Nicoletti than to fight for his freedom, DROP payment, and pension, so he lied to millions around the world.

378.    During a deposition with Plaintiff (19-cv-4615), Wilson admitted he lied to millions because "the heat" got too much for the city.

> Q.    What is the departmental policy for the application of pepper spray to a person or persons wearing goggles or a mask?
>
> A.    The SOP at SWAT contradicts the fact that he failed to follow policy, if that's where you're going with this.
>
>     SWAT's own SOP says that he did the right thing.
>
> Q.    And when you say SOP, that means standard operating procedure. Is that correct?
>
> A.    Yes.
>
> Q.    So Officer Nicoletti was following standard operating procedure.

*Wilson deposition pages with Plaintiff Jacobs v City of Philadelphia (19-cv-4615) pages 33-34*

Who was present at that press conference?

A.    The Commissioner, the Deputy, the Mayor, the Managing Director, the media.

Q.    You volunteered to participate in that press conference at the time, knowing at the time of that press conference your decisions were correct.

Is that your belief?

A.    Yes, it is.

Q.    It's your decision?

A.    Yes, it is.  Absolutely, I feel to this day that I made the right decision.  Everyone knew that decision was going to be made.  And I took a voluntary demotion when the heat, I guess got too much for the City.

And I wanted to --- it was happening whether I wanted it or not.  And I wanted to try to walk out with my head held high.  So that's --- that's the --- that's the truth there.

*Wilson deposition with Plaintiff Jacobs v City of Philadelphia (19-cv-4615) pages 50-53.*

40

*Inspector James Smith and Detective Patrick Smith*

379.    Inspector James Smith ("Inspector Smith") recruited Detective William Sierra and Detective Derrick Jacobs to the newly formed Officer Involved Shooting Investigation Unit ("OISI") from the Homicide Division in 2017 at the recommendation of the Department of Justice ("DOJ").

380.    In August 2018 Inspector Smith learned his subordinate, Lieutenant Jason Hendershot, was participating in the illegal criminal prosecution of former Philadelphia Police Officer Ryan Pownall with the DAO.

381.    Inspector Smith also learned from Patricia Cummings and Tracy Tripp that Krasner's DAO wanted Sierra and Jacobs removed from OISI because of their race.

382.    An irate Inspector Smith immediately went to OISI headquarters and admonished Hendershot regarding his "participation" in the illegal Ryan Pownall investigation.

> Q.    Did there come a time where Inspector Smith, prior to him leaving the detective bureau, admonish you in front of the unit?
>
> A.    Yes.
>
> Q.    Okay.
>
> A.    It was either Inspector Smith or Chief Inspector Kelly.  I can't recall which one.
>
> Q.    And what was the reason for that admonishment?
>
> A.    The reason for that admonishment was in regards to the presentment and subsequent arrest of Ryan Pownall.

*Hendershot deposition with plaintiff. Jacobs v City of Philadelphia (19-cv-4616) pages 91-92*

383.    Inspector Smith informed Deputy Police Commissioner Dennis Wilson ("Wilson") of the illegal Pownall investigation.

384.    Inspector Smith also informed Wilson of Tripp and Cummings racially charged comments regarding Sierra and Jacobs.

385.     On orders from Krasner, Wilson immediately transferred Inspector Smith and Chief Inspector James Kelly from the Detective Bureau Command Staff.

386.     Wilson replaced the Detective Bureau Command Staff with Chief Inspector Frank Vanore and Inspector Benjamin Naish.

387.     Krasner subsequently retaliated against Inspector James Smith and his brother, Detective Patrick Smith ("Smith brothers") by initiating a fabricated criminal investigation, arrest and prosecution of because of their (Inspector Smith) support for Jacobs.

388.     On or about August 19, 2020, two law enforcement officers (Smith Brothers) with over fifty (50) years combined experience observed what they believe to be criminal activity.

389.     Inspector James Smith, who had recently received medical treatment for a back injury, immediately dialed 911 and identified himself as a Philadelphia Police Inspector and reported their observations.

390.     Inspector Smith never left the vehicle.

391.     Krasner ordered his DAO to conduct a retaliatory investigation to arrest Inspector Smith and Detective Patrick Smith (collateral damage) because of Inspector Smith's support of Plaintiff.

392.     The fabricated investigation was originally assigned to Timothy Thompson from the DAO.

393.     Timothy Thompson wanted to arrest "Krasner's victim" for his alleged criminal activity.

```
Q.    Were you the SIU supervisor when Inspector
James Smith and Detective Pat Smith was arrested?
            MR. SMITH:    Objection.    Direct the
```

42

witness not to answer.

BY MR. JACOBS:

Q.  Were you involved in the investigation of Inspector James Smith and Detective Pat Smith?

MR. SMITH:  Objection.  Direct the witness not to answer.

BY MR. JACOBS:

Q.  Did District Attorney Larry Krasner have Inspector James Smith and Chief Inspector Kelly removed after a confrontation that Inspector Smith had with you?

MR. SMITH:  Objection.  Direct the witness not to answer.

BY MR. JACOBS:

Q.  Did you have a confrontation in your office involving Inspector James Smith, Patricia Cummings and Lieutenant Robert Otto prior to the Ryan Pownall grand jury presentment?

MR. SMITH:  Objection.  Direct the witness not to answer.

BY MR. JACOBS:

Q.  Did you have an investigator at the District Attorney's Office by the name of Timothy Thompson?

A.  I'm sorry.  I didn't hear the word you used.

Did we have a what?

Q.   Did you have someone who worked in the Special Investigations You unit in the -- I'm sorry, in the District Attorney's Special Investigations Unit by the name of Timothy Thompson?

A.   Yes.

Q.   And what was Timothy Thompson's duties?

THE STENOGRAPHER:  Excuse me.  This is the court reporter, I feel I need to disclose because you just brought up a name that I am possibly familiar with.

MR. JACOBS:  Okay.

THE STENOGRAPHER:  So, I do not know how you would like to proceed with that information.

MR. JACOBS:  Wow.

MR. SMITH:  Ms. King --

MR. JACOBS:  Can we go off the record for a second to figure out --

THE STENOGRAPHER:  No.  Because I'm the court reporter, I have to stay on the record.

MR. JACOBS:  I got you.  Sorry.

MR. SMITH:  Ms. King, I am going to

allow the witness to answer this one question, and then I am going to cut if off with a direction not to answer.  So, I -- hopefully, that will not put you in an awkward position.

THE STENOGRAPHER:  Not at all.  I just wanted to make sure to disclose that.

MR. SMITH:  Yeah.  We appreciate.

MR. JACOBS:  Thank you.

THE WITNESS:  Just to be clear, sir, I believe the question was, what were Timothy Thompson's duties?

MR. JACOBS:  That's correct.

THE WITNESS:  Detective Thompson was a County Detective.  And he had all of the duties that county detectives assigned to the investigative subsection of the DA's Office would have.

BY MR. JACOBS:

Q.  And to make this quick, because I don't want to draw too much on it, but Detective Thompson is no longer with the DA -- District Attorney's Office; is that correct?

A.  Yes.

Q.    And the reason he left is because he objected to the arrest of Inspector James Smith and Detective Pat Smith and said there was no probable cause; is that correct?

MR. SMITH:    Objection.    Direct the witness not to answer.

BY MR. JACOBS:

Q.    Did Detective Thompson ever inform you there was no probable cause to arrest Inspector Smith and Detective Pat Smith?

MR. SMITH:    Objection.    Direct the witness not to answer.

BY MR. JACOBS:

Q.    Did you listen to the police radio transmissions the led to the arrest of Inspector James Smith and Detective Pat Smith?

MR. SMITH:    Objection.    Direct the witness not to answer.

BY MR. JACOBS:

Q.    Did the District Attorney order the Special Investigations Unit to illegally arrest Inspector James Smith and Detective Pat Smith knowing what was on the police radio transmissions was a lie as he alleged during the press conference?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. JACOBS:

Q. Did District Attorney Lawrence Krasner hold a press conference to announce the arrest of Inspector James Smith and Detective Pat Smith?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. JACOBS:

Q. And during that press conference, did District Attorney Larry Krasner state that Inspector James Smith identified himself as, quote/unquote, town watch?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. JACOBS:

Q. And did the police radio transmissions bear out the fact that Inspector Smith identified himself as a police inspector?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. JACOBS:

Q. Was the reason that District Attorney Krasner targeted Inspector James Smith and his brother

Detective Pat Smith because they stood up for the Plaintiff and would not do what the District Attorney wanted them to do and retaliate against the Plaintiff.

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. SMITH:

Q. Why was Inspector James Smith arrested, Ms. Tripp?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. JACOBS:

Q. Did Inspector Smith commit any crime, Ms. Tripp?

MR. SMITH: Objection. Direct the witness not to answer.

BY MR. SMITH:

Q. Did Detective Pat Smith commit any crimes, Ms. Tripp?

MR. SMITH: Objection. Direct the witness not to answer.

*Tracy Tripp deposition by Plaintiff (19-cv-4616) pages 55-61.*

394.    Krasner insisted on arresting the Smith brothers for not committing ANY crime, only for Inspector Smith's support for Jacobs.

395.    Timothy Thompson refused to arrest the Smith brothers and requested removal from Krasner's DAO, due to their corruption and illegal activity.

396.    Krasner contacted Outlaw and Wimberly for their assistance.

48

397.     Krasner wanted the Philadelphia Police Department's Investigative Support Service ("ISS") from Internal Affairs to fabricated an investigation and warrant to arrest the Smith brothers.

398.     Zachary Koenig from Internal Affairs prepared the FABRICATED documents to arrest the Smith brothers.

399.     Koenig stated the Smith brothers were witnesses to criminal activity and he informed his superiors and "others" he wanted to use them as witnesses to their observations and arrest "Krasner's victim."

400.     Koenig was later bribed and/or extorted to fabricate the documents to illegally arrest the Smith brothers from Krasner, Outlaw, and Wimberly.

401.     On April 1, 2021 Inspector James Smith and his brother Detective Patrick Smith were arrested.

402.     This continued Krasner's pattern and practice of targeting sworn law enforcement officers with fabricated investigations and arrests.

403.     Krasner held a press conference announcing the arrest of the Smith brothers who he claimed called police as "**town watch**" and acted as "**vigilantes**."

404.     The arrest was solely and for no other reason than Inspector James Smith supporting his subordinates and not allowing Krasner to pursue criminal actions and racial discrimination against law enforcement officers.

405.     "Chief Inspector" Dennis Wilson (now assigned to Communications after being forced to lie to millions and his demotion), listened to the 911 call and informed his superiors that Krasner was lying in order to arrest the Smith brothers.

406.     The Philadelphia Police Department (Outlaw) refused to intervene and stop Krasner's illegal activity after listening to the 911 transmission herself.

407.     The case against the Smith brothers were DISMISSED.

408.     Krasner continued to waste hundreds of man hours, tens of thousands of dollars, and resources to continue his fabrication of MISDEMEANOR charges.

409.     Krasner continued his assault on these decorated law enforcement officers all the way to the Pennsylvania Supreme Court.

410.     During an arbitration hearing the Smith brothers were further vindicated against Krasner's criminality.

411.     Thompson, Koenig, and others admitted to Krasner's criminal activity in the illegal retaliatory prosecution of the Smith brothers, but fearing reprisals remained silent.

412.    **Inspector Joseph Bologna (24-cv-3185):** Krasner, Tripp, and Sergeant Gerald Rocks from Krasner's DAO fabricated an investigation and criminal charges Inspector Bologna. Defendants also attempted to have a medical examiner for more than three decades change his findings (same as they did with Jacobs) to arrest Bologna. *Note: As the result of the illegal arrest of Bologna and Nicoletti, Krasner procured over nine million dollars for the rioters.*

413.    **James Saxton, Mark Dial, Daniel Levitt and others (too many):** As the pattern and practice of Krasner's DAO policies under Krasner all were targeted with fabricated, tampered, and destroyed exculpatory evidence to secure arrest.

414.    **Detective Jacobs AGAIN:**



As a result of the above Philadelphia Weekly article Defendants began an illegal electronic surveillance seizure of Jacobs immediately upon learning of the article and violated Jacobs constitutional rights (24-cv-3051).

*Krasner's Corruption Act VII*

*Federal District Court Judge Harvey Bartle III*

*Judge Bartle GRANTED the Defendants' Motion for Summary Judgment*

**Jacobs v City of Philadelphia (19-cv-4616) Documents 186 and 187 Dated March 21, 2024**

415.　　On October 4, 2019, Jacobs filed a Federal Civil Complaint against Lawrence Krasner and the City of Philadelphia (19-cv-4616).

416.　　The complaint was assigned to Senior Federal Court District Judge Harvey Bartle III ("Judge Bartle," "Bartle," "Defendant(s)").

417.　　On March 21, 2024, Judge Bartle authored a Memorandum (Document 186). The Memorandum GRANTED the Defendants' Motion for Summary Judgment (In violation of Plaintiff's Seventh Amendment Right) and DENIED the Plaintiff's Motion for Summary Judgment.

418.　　The Memorandum was littered with, at best, "intentional distortions" and "intentional omissions" of the "material facts" in the record. The Memorandum at worse is "littered" with "intentional" LIES. The Memorandum also "intentionally" authored "information" NOT found anywhere in the record and presented it as facts. In the Plaintiff's opinion and professional expertise, the Memorandum was "littered with lies." The Memorandum authored by Judge Bartle showed a clear bias, misrepresentation of the facts, intentional omissions, *ex parte* communications, and a "clear absence of all jurisdiction" and "clear constitutional" violations.

419.　　The record is DEVOID of facts as listed in the Judge Harvey Bartle's "decision" (Document 186).

420.　　Jacobs, being an Officer of the Court, has always held the judiciary with the highest regard.

421.　　Judge Harvey Bartle III was not an exception until the investigator in Jacobs uncovered numerous acts of bias, fabrications, and discrimination.

422.　　Those acts of bias included numerous violations of the judicial code of ethics.

423.　　Those acts included multiple ex parte conversations with the defendants.

424.　　Those acts included intentionally "hiding" criminally forged evidence by claiming "FORGERY in Plaintiff's name" were privileged in furtherance of the conspiracy of criminal activity.

　　a.　On or about August 15, 2023, Defendants conducted a deposition (over two days and twelve hours) of Plaintiff. *Note: Defendants did not include and refused to provide the depositions only an excerpt that said absolutely nothing in their conspiracy with the Court.*

51

b. During the deposition Defendants produced a forged document in PLAINTIFF'S NAME!

c. The Plaintiff's name was HANDWRITTEN in blue ink (presumably by Assistant District Attorney Tracy Tripp), who's counsel presented the FORGED document in Tripp's presence.

d. The Plaintiff immediately called out the forged document authored by Defendants in his name. *Note: Although requested numerous times through discovery this portion of deposition never provided. Court never imposed sanctions as requested by Plaintiff.*

e. Defendants quickly removed the document and placed it in an oversized briefcase with the "lost transcripts."

f. Also, during the deposition, the "MISSING" transcripts were shown to Plaintiff.

g. Harvey Bartle III (the Court) then authored an egregious LIE and hid Defendants' criminal activity by claiming an ILLEGALLY FORGED DOCUMENT in the PLAINTIFF'S NAME was "privileged."

h. The record is DEVOID of any evidence/material facts to support such a claim.

> Jacobs also argues that Defendants have not produced, according to him, "a fabricated document dated May 2017." Jacobs identified this document by its Bates number in a subsequent Motion to Compel and Request for Sanctions dated December 14, 2023 (Doc. #166). The document, which was reviewed in camera by this court, is an order from Pennsylvania Judge Robert Coleman relating to grand jury proceedings in state court. Under Pennsylvania law, "orders . . . relating to grand jury proceedings shall be kept under seal." 234 Pa. Code R. 556.10. Only the judge that supervised the proceedings can authorize disclosure.

*Jacobs v. City of Philadelphia (19-cv-4616), Document 167, pages 2-3.*

**Plaintiff Jacobs** informed the Court the defendants forged a document in Plaintiff's name. The Court's "response" was "the document, which was reviewed in camera by this court, is an order from Pennsylvania Judge Robert Coleman relating to grand jury proceedings in state court."

52

There is NO evidence this FORGED document was "an Order" from Judge Robert Coleman. The Court did not hold an evidentiary hearing to ascertain the VALIDITY of the FORGED document in PLAINTIFF'S name.

The Court, in furtherance of Defendants' criminal activity, hid a criminal act from view as "privileged."

This document WAS NEVER viewed/reviewed by Judge Robert Coleman. There was NEVER an ORDER by Judge Robert Coleman. There is ZERO evidence this document was VIEWED and an ORDER issued by Judge Robert Coleman. If the Court would have held an evidentiary hearing, which it intentionally did not, it would have proven Defendants' criminal activity. The Court had knowledge of Defendants' criminal activity and in furtherance of that activity, hid the document under "privilege" when it WAS NOT a privileged document, it was a FORGED document, not viewed by any court but THIS COURT. The plaintiff could have produced no less than TEN witnesses proving the document was a FORGERY and a CRIME.

425.    The Court removed the "original" defendant City of Philadelphia as a defendant without any party filing a motion, to intentionally deprive the plaintiff of his constitutional rights.



HB

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

Civil Division

Detective Derrick Jacobs

Plaintiff(s)

(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names)

–v–

City of Philadelphia, Philadelphia District Attorney's Office, Lawrence S. Krasner, Tracy Tripp et al

Defendant(s)

Case No.  19    4616

(to be filled in by the Clerk's Office)

Jury Trial: (check one)  ☒ Yes   ☐ No

426.    The Court used Tripp's "recollection" from the September 27, 2018 bypass hearing to intentionally author statements the Court knew were false to violate Jacobs' constitutional rights.

427.    The Court knew the transcripts were not lost and they knew Tripp's statements were lies after viewing the transcripts.

428.    The Court viewed the "lost" transcripts and criminally falsified the record in furtherance of Defendants' criminal activity and violation of Plaintiff's constitutional rights.

429.    The Court intentionally falsified "Perri's statements" and authored "according to Tripp," when the Court knew her statements were lies. *19-cv-4616, Document 186, pages 4-5.*

430.    **The Court offered the following statement attributed to Hendershot during his deposition.**

Lieutenant Hendershot testified as to his comments to Tripp: *(19-cv-4616, Document 186, Page 6).*

I [Hendershot] relayed to ADA Tripp that you [Jacobs] were either on the floor or in the room - I don't remember which one - during the hearing. And I don't recall what hearing it was, but it was in reference to Pownall. And if I'm remembering correctly, defense counsel made some type of comment to you about why are we here or how did we get here. And you replied . . . "I don't know. I wasn't involved in the grand jury," or something to that effect. *Hendershot deposition Pages 124-125.*

Here is completed version of Hendershot's testimony during exchange referenced by the Court.

*Again, word-for-word I can't tell you. But in summary, after speaking with you, I relayed to ADA Tripp that you were either on the floor or in the room -- I don't remember which one -- during the hearing. And I don't recall what hearing it was, but it was in reference to Pownall. And if I'm remembering correctly, defense counsel made some type of comment to you about why are we here or how did we get here. And you replied, again, I don't know word-for-word, I don't know. I wasn't involved in the grand jury or something to that effect. Again, I don't want to put words in your mouth. I don't remember exactly what you said and what I relayed back to ADA Tripp verbatim.* ***But it was something along those lines that you don't know because you were not involved in the grand jury.***

*Q. And I also called Tracy Tripp and Larry Krasner during that phone call criminals, didn't I?*

*A. I don't remember your exact words. Knowing you, you probably did.*

*Q. If I called them criminals in 2018 and you just said knowing me, being upfront like I am, why would 2020 be any different with me calling them criminals when I've been telling you they were criminals for two years?*

*MR. GONZALES (Hendershot's counsel): Objection. Speculation.* ***Hendershot Deposition Pages 124-125.***

54

A.    Again, word-for-word I can't tell you. But in summary, after speaking with you, I relayed to ADA Tripp that you were either on the floor or in the room -- I don't remember which one -- during the hearing. And I don't recall what hearing it was, but it was in reference to Pownall. And if I'm remembering correctly, defense counsel made some type of comment to you about why are we here or how did we get here. And you replied, again, I don't know word-for-word, I don't know. I wasn't involved in the grand jury or something to that effect.

Again, I don't want to put words in your mouth. I don't remember exactly what you said and what I relayed back to ADA Tripp verbatim. But it was something along those lines that you don't know because you were not involved in the grand jury.

Q.    And I also called Tracy Tripp and Larry Krasner during that phone call criminals, didn't I?

A.    I don't remember your exact words. Knowing you, you probably did.

Q.    If I called them criminals in 2018 and you just said knowing me, being upfront like I am, why would 2020 be any different with me calling them criminals when I've been telling you they were criminals for two years?

MR. GONZALES:  Objection.  Speculation. You can answer if you understand.

THE WITNESS:  I really don't understand what you're asking me.

BY MR. JACOBS:

Q.    Since you've known me and became my commanding officer, have I always called Lawrence Krasner a criminal?

MR. GONZALES:  Objection.  You can answer.

THE WITNESS:  I heard you say that many times.

BY MR. JACOBS:

Q.    And after Tripp's false accusations of the leak of grand jury information, did I begin to call her a criminal as well?

MR. GONZALES:  Objection to the form. There's a preamble there, but I'll let the witness answer the question.

THE WITNESS:  I do recall you calling her a criminal.

BY MR. JACOBS:

Q.    So when I called her and Krasner criminals on the podcast, why did it shock anyone?

MR. GONZALES:  Objection.  It calls for speculation about other people.

BY MR. JACOBS:

Q.    Well, why did it shock you?

MR. GONZALES:  Objection.

THE WITNESS:  Say that again.

BY MR. JACOBS:

Q.    When you heard that I called Krasner and Tripp criminals, based on the criminal acts that I had previously alleged, why did it shock you when you heard me call them criminals on that podcast?

A.    I don't believe I ever said that it shocked me.  So I don't know if I can answer that any better for you.

*Hendershot deposition pages 123-126*

431.    The Court and Defendants attempted to craft their fabricated story that Jacobs "leaked" grand jury information that he had no knowledge of to an attorney (Fortunato "Fred" Perri) on the date of the bypass hearing on September 27, 2018.

Tripp deposition testimony under oath proved otherwise and the fabrications by Defendants and the Court. During Tripp deposition she was asked by Jacobs when the "leak" occurred and she stated the following:

*BY MR. JACOBS:*

*Q. Did you believe that the conversation with Mr. Perri took place on that day?*

*A.  I -- I -- no, I do not know. I didn't know at that time.*

*Q. Why did you ask Lieutenant Hendershot who was in court on that day then? (Tripp's deposition, Page 42).*

```
BY MR. JACOBS:

Q.   Did you believe that the conversation with

Mr. Perri took place on that day?

A.   I -- I -- no, I do not know.  I didn't know at

that time.

Q.   Why did you ask Lieutenant Hendershot who was

in court on that day then?
```

So, if Defendants never mentioned a grand jury leak (Hendershot) and Defendants don't know when the grand jury leak occurred (Tripp). How does the Court author a Memorandum that stated Jacobs "admitted" to being in court that day, inferring Jacobs leaked grand jury information WITHOUT any evidence, testimony, and/or facts supporting the Court's "OPINION?"

The Court knew Jacobs was "in court" that day coordinating his homicide trial, by the way.

The Court also knew there was NEVER a grand jury leak because it VIEWED the "lost transcripts" in camera.

432.    The Court then authors a knowingly and intentional omission and fabricated statement(s).

The Court authored the following:

57

Sometime later the transcripts for the September 27, 2018 bypass hearing and the *November 9, 2018* grand jury proceeding were lost. "**Lacking this evidence,**" Tripp never brought any contempt of court charges against Jacobs. He concedes that he was never arrested, charged, or indicted by the "Pownall grand jury" (intentional deception). *(19-cv-4616 Document 186, page 6-7).*

It was "Jacobs" grand jury not "Pownall" grand jury) never issued any presentment as to and him.

The Court and Defendants continually conspired to fabricate the record as the Court became the gatekeeper to violate Jacobs' Constitutional Rights.

Jacobs does concede his was never arrested, charged, or indicted. Jacobs does not concede it was because of "LOST TRANSCRIPTS." It was because Jacobs did not commit any crime. The record is clear. The defendants wanted to chill Jacobs' speech and threatened his with charges in bad faith where no crime was ever committed and the Court knew this after viewing THE TRANSCRIPTS.

The "Pownall" grand jury operated under the twenty-ninth county investigating grand jury. The grand jury issued Presentment #4 relating to the shooting death of David Jones.

The "Jacobs" grand jury operated under the same twenty-ninth county investigating grand jury. The grand jury did not return a Presentment as it related to Jacobs because Jacobs did not commit a criminal act and it was convened in bad faith to chill Jacobs' speech, not because of lost transcripts.

The Court authored Jacobs spoke with "Pownall's attorney" not Jacobs' FOP attorney. Jacobs has maintained he consulted with his FOP attorney and Defendants attempted to usurp Jacobs' constitutional rights through his commanding officer (Hendershot).

This is a known fabricated statement by the Court. Judge Bartle intentionally hid the "lost transcripts" by claiming they were "privileged" in response to Defendants SHOWING Jacobs the transcripts and a FORGED document during the defendants' deposition of Jacobs

DERRICK JACOBS                                                    August 15, 2023
DERRICK JACOBS V. CITY OF PHILADELPHIA                            141–144

58

```
                                                    Page 141
    duty, except or authorized by law or permitted by the
    Court, do you so swear or affirm?
    A.   Correct.
    Q.   And you said I do.
         Correct?
    A.   Correct.
    Q.   And you understood that direction from the Court.
         Correct?
    A.   Correct.
         ATTORNEY DUNCAN:  Let's mark as Exhibit
    26, a transcript dated November 9, 2018.
              ---
              (Whereupon, Jacobs Deposition Exhibit 26,
              Transcript 11/9/2018, was marked for
              identification.)
              ---
    BY ATTORNEY DUNCAN:
    Q.   Have you seen the transcript of your testimony on
    November 9, 2018 before I just handed you the exhibit
    in this room?
    A.   I was told the court transcripts was lost.  I
    haven't seen any transcript other than the one you
    provided at C-25 and now, I'm sorry, Jacobs 25 and now
    Jacobs 26.
    Q.   So have you seen 26 before?
```

*Defendants' deposition of Plaintiff on August 15, 2023, page 141.*

This was clearly an INTENTIONAL fabricated statement by the Court. The defendants, as you can clearly see, attached document 169-5 to THEIR motion for summary judgment filed on December 29, 2023 as "Exhibit E."

```
During his appearance before the grand jury on November 9, 2018,

Tripp asked Jacobs whether he had spoken with Perri or any other

attorneys representing Pownall about the Pownall shooting.

Jacobs responded by invoking his Fifth Amendment privilege

against self-incrimination.
```

*Jacobs v City of Philadelphia (19-cv-4616) Document 186, Judge Harvey Bartle III Memorandum, Page 6.*

If the November 9, 2018 transcripts were lost and thereby no testimony available to the Court; how could the Court author "Jacobs" testimony when there is "no record" of the November 9, 2018 hearing because the "transcripts were lost?" The BIAS and CORRUPT Court authored Jacobs asserted his constitutional right against "self-incrimination," indicating and defaming Jacobs as protecting himself from criminal activity whereas the record showed no criminal activity ever occurred.

59

433.    The Court continued the furtherance of Defendants' criminal activity by authoring Judge Coleman did not give Jacobs' permission to view grand jury information.

```
        As this court explained in its order dated December

   18, 2023 (Doc. #167), Pennsylvania law permits the release of

   grand jury information only with permission from the judge who

   supervises the grand jury proceedings.  234 Pa. Code R. 556.10.

   Jacobs never received such permission from Judge Coleman.  On
```

*Jacobs v City of Philadelphia (19-cv-4616) Doc. #186, page 17.*

In May of 2018 Jacobs was sworn in an investigator/law enforcement officer in the fabricated Pownall investigative grand jury.

As an investigator Jacobs was granted permission by Judge Coleman to participate in the proceedings and access to the information.

This was ADA Tracy Tripp's FIRST grand jury as a prosecutor and the misrepresentations made by Defendants and the Court were intentional.

Furthermore, Defendants FORGED a document in Plaintiff's name (Derrick Jacobs) dated May 2017 which the Court decided an illegal document FORGED in the plaintiff's name was viewed by the Judge Coleman and considered "privileged." This is clearly criminal activity, after the fact by the Court.

Plaintiff realized the term "lacked candor" has been used many times as it pertains to Defendants, but this was a lie so egregious that it caused Harvey Bartle III to act outside of his judicial responsibilities to further the criminal activity of Defendants.

Also, in contrast to the Court's opinion, Judge Coleman had already released the grand jury transcripts that immediately shed a spotlight on the defendants' nefarious actions against law enforcement.

On November 25, 2019, Pownall, through his attorneys, filed a motion seeking the transcripts, which Judge Coleman GRANTED on December 11, 2019 and they received on December 12, 2019.

> On that same day, the Defendant filed a Motion seeking the transcripts and materials
>
> from the Grand Jury proceedings. *See* 234 Pa. Code Rule 230(B)(3).[3] On December 11, 2019,
>
> Judge Coleman granted the Defendant's Motion and the materials were delivered to the
>
> Defendant on December 12, 2019. On December 18, 2019, within a week of receiving the
>
> transcripts, the Defendant filed a Motion to Quash the Presentment and for Dismissal of All
>
> Charges. Before this Court could rule on the Defendant's Motion to Quash, the Commonwealth

*Judge Barbara McDermott Findings of Fact, dated October 17, 2022, page 2.*

In Hendershot's Affidavit of Facts, he authored OISI (Jacobs) had access to the grand jury transcripts.

> On October 26, 2022, Detective Brian Newell – the assigned investigator for this police shooting – and I met with ADA Brian Collins, ADA Vincent Corrigan and ADA Lyandra Retacco at the DAO. Based upon conversations with ADAs Collins, Corrigan and Retacco, the DAO requested that OISI Unit review all of the facts gathered during the investigation. In addition, OISI was directed to review evidence that was presented to the Investigating Grand Jury. The DAO further requested that OISI submit the facts of this investigation for review.
>
> Detectives Murawski, Newell and I reviewed the facts gathered during the course of the investigation conducted by the OISI Unit and reviewed facts gathered during the Grand Jury investigation. Listed below are the facts that OISI learned during the review of this case.

*Hendershot's Affidavit of Facts, page 1. Jacobs v City of Philadelphia (19-cv-4616) Document 102-1.*

Plaintiff informed the Court on "multiple" occasions the "transcripts" were not lost and the defendants fabricated documents *(Doc. 134 (page 16), Doc.141 (pages 3-4), Doc. 156 (page 1), Doc. 162 (page 3-4)*.

This evidence was placed in the record by the Plaintiff and intentionally ignored and omitted by the Court in the furtherance of criminal activity.

The plaintiff also viewed the bypass motion transcripts from September 27, 2018 with his then attorney Greg Pagano on November 9, 2018.

If the transcripts were lost how did Pownall receive them and immediately file for a Motion to Dismiss (Quash) ALL charges, which was ultimately GRANTED by Judge McDermott.

The Court knew/knows Krasner was/is illegally arresting police officers and releasing convicted murderers.

The evidence clearly showed a willingness by the Court to mislead ALL, including but not limited to, the Third Circuit Court of Appeals. Let's address the alleged violation(s) committed by Plaintiff. Lieutenant Jason Hendershot said the Plaintiff was targeted and "did not" commit any violations during his deposition on November 17, 2023.

JASON HENDERSHOT

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


     _____
     DERRICK JACOBS,                    :
                                        :   CIVIL COMPLAINT
            Plaintiff                   :   NO. 19-CV-4616
                                        :
            -VS-                        :
                                        :
     CITY OF PHILADELPHIA, et al.,      :
                                        :
            Defendants                  :
     _____

                       * * * * *

              FRIDAY, NOVEMBER 17, 2023

                       * * * * *


        Videoconference deposition of JASON
   HENDERSHOT, was taken at the law offices of Marshall,
   Dennehey, Warner, Coleman & Goggin, 2000 Market
   Street, Philadelphia, Pennsylvania, before Renee
   Schumann, a Notary Public of the State of New Jersey
   and Notary Public of the Commonwealth of
   Pennsylvania, on the above date, commencing at 11:24
   a.m.
```

434.    **Staffing levels**:

The Court authored:

Jacobs likewise acted outside of the chain of command when he discussed "confidential police information" on the podcast without permission from his superiors.

*Jacobs v City of Philadelphia (19-cv-4616) Document 186, page 26).*

62

Q.    We'll get back to that.  In Jacobs's disciplinary documents you stated that he divulged staffing levels.  What staffing levels that was not publicly available did Jacobs divulge?

A.    Staffing levels of the Officer-Involved Shooting Investigations Unit.

Q.    Was those staffing levels already available to the public?

A.    I have no idea.  I don't believe so.

Q.    Did you check?

A.    No, I did not.

*Deposition of Jason Hendershot on November 17, 2023, pages 32-33*

So, if Plaintiff's Commanding Officer did not know and/or did not check to see if Jacobs violated departmental policy; how could the Court know with Hendershot's testimony being the only evidence in the record. These are more "intentional" omissions/insertions by the Court in the furtherance of the DAO and Philadelphia Police Department ("PPD") criminal activity.

Q.    And you also don't know whether or not that information is publicly available, do you?

A.    I thought it was confidential.  I just didn't know.  I guess I was wrong.

Q.    Oh, you were wrong.  Meanwhile, I sit here unemployed because you were wrong; is that correct?

*Deposition of Jason Hendershot on November 17, 2023, page 60.*

Q.    Where does it say in any departmental document that any member of the Philadelphia Police Department needs additional approval to recite publicly available information?

A.    I don't know where they would be contained.  That's my belief.

Q.    So your belief is you can discipline anybody at any time for anything; is that correct?

MR. GONZALES:  Objection.  You can answer.

THE WITNESS:  No.

Q.    Well, we already have on the record you didn't verify whether it was publicly-held information.  You don't realize when the detective

64

said it. You didn't do any follow-up investigations to see if it was publicly-held information. And now that you see that it was already out there in the public, you're saying that Detective Jacobs, in order to not be disciplined by Lieutenant Hendershot, needs to jump through additional hoops that no citizen of the United States of America has to jump through in order to keep from getting disciplined by Lieutenant Hendershot; is that correct?

MR. GONZALES: Objection to the form of the question. If you understand it, you can answer.

THE WITNESS: I don't understand what you're asking me.

Q.    Is it your position that Detective Jacobs needs to jump through an additional hoop that no other member of the Philadelphia Police Department needs to jump through?

A.    That's not my position. My position is this. I had no knowledge that document existed until you just showed it to me. My position is this. When

*Deposition of Jason Hendershot on November 17, 2023, pages 69-70.*

The Court authored Jacobs disclosed confidential police information when Hendershot testified, he did not check and "he was wrong" and didn't know. So how did the Court know and make Defendants right. The evidence belies that "conclusion." Furthermore, the record showed the information was not "confidential police information." The record showed Jacobs DID NOT disclose information, he recited "PUBLIC" information.

In furtherance of their premeditated retaliation against Plaintiff for exposing corruption and criminal activity, the defendants did not conduct any additional interviews during their "investigation."

> Q.    The question was, when you conducted the interview of Detective Jacobs and at that time when the interview was completed, based on the questions that you asked and the answers that were provided on that date, did you subsequently seek to interview Deputy Police Commissioner Dennis Wilson?
>
> A.    No.
>
> Q.    So you did not attempt to reconcile any answer provided by Detective Jacobs in that interview, did you?
>
> A.    I felt there was no need to.

*Deposition of Jason Hendershot on November 17, 2023, page 75.*

435.    **Outside Chain of Command**:

BY MR. JACOBS:

> Q.    So if a memorandum from a subordinate is submitted up the chain of command to the police commissioner, the police commissioner should receive that memorandum, approve or disapprove it and send it back down the chain of command to the member who authored it; is that correct?
>
>           MR. SHEEHAN:    Objection to form.
>
>           You can answer.
>
> A.    That is correct.

*Deposition of Christine Coulter on April 28, 2022, page 48*

66

Prior to our meeting in your office, did you receive any other memorandums of the chain of command regarding Plaintiff Jacobs asking --- asking for whistleblower protections?

A. Not to my knowledge. And never did I receive a memo requesting that.

*Deposition of Dennis Wilson on August 4, 2022, page 242*

Did Plaintiff Jacobs on October 4th, 2019 provide you with a memorandum asking you for whistleblower protections?

*Deposition of Christine Coulter on April 28, 2022, page 35*

BY MR. JACOBS:

Q. On November 8th, did you receive another memorandum from Plaintiff Jacobs?

A. I'm not sure. I know I received another correspondence with the same information and I believe I said I received, but I had spoke with Deputy Wilson who told me he informed you of our conversation, my conversation previously and what the path was that you had to do to file a formal complaint.

Q. What date did that conversation take place with Deputy Commissioner Wilson?

A. It was several days after your original memo because that's when information was relayed back to me.

Q. Was it more than a week later?

A. I couldn't tell you. It was

probably somewhere several days to a week.  I couldn't tell you the exact time.

Q.   Was it a month later?

A.   I don't believe it was a significant amount of time, so I would say it was probably around a week.

*Deposition of Christine Coulter on April 28, 2022, pages 41-42*

Q.   So if documents or memorandums were submitted up the chain of command that did not reach you, would that be a violation of the policy?

A.   If they were addressed to me, yes.

*Deposition of Christine Coulter on April 28, 2022, pages 47- 48*

Q.   Okay.

So if a memorandum is directed to Deputy Police Commissioner Wilson, then that memorandum should go to Deputy Police Commissioner Wilson.

Is that correct?

A.   No.

*Deposition of Dennis Wilson on April 4, 2022, pages 224-225*

The evidence in the record showed Wilson lied and violated departmental policy in the retaliation against Jacobs and in furtherance of criminal activity. The Court authored Jacobs did not follow the chain of command when clearly the opposite is true in the furtherance of Defendants criminal activity.

436.    **Grand Jury Leak:**

The Court authored:

> Third, it is not disputed that Tripp summoned Jacobs to testify before the grand jury. But under the circumstances presented here, Tripp's summons was not retaliation. She had a good faith belief that he violated grand jury secrecy – conduct that is not protected under the First Amendment.

*Jacobs v City of Philadelphia (19-cv-4616) Document 186, Page 20.*

Q.    Prior to the filings of this lawsuit, did you and the Plaintiff discuss the impending retaliation that was going to be inflicted upon him by District Attorney Larry Krasner?

A.    I don't remember the exact words that we spoke of, but I do remember having conversations consisting of something around those lines. Exactly what was said, I could not tell you. But that's -- that's my answer. I don't remember exactly what we spoke about every time.

*Deposition of Jason Hendershot on November 17, 2023, pages 110-111.*

Q.    The question was, did you inform Deputy Commissioner Wilson that Tracy Tripp -- what Tracy Tripp was alleging did not happen? That the Plaintiff did not leak grand jury information?

A.    I did inform him of that in my opinion.

Q.    Did you inform him of that in September of 2018?

A.    I don't remember the exact time. The

*Deposition of Jason Hendershot on November 17, 2023, page 121.*

69

Why did the Court **"intentionally omit"** the testimony of Jacobs' Commanding Officer, Lieutenant Jason Hendershot regarding the fabricated grand jury leak retaliation. Lieutenant Hendershot testified he informed his, and Jacobs, superiors and "other people" that Jacobs "did not" leak grand jury information. Hendershot testified he informed then Deputy Philadelphia Police Commissioner Dennis Wilson the grand jury leak story was a lie. **With the material facts in the record clearly stating "BAD FAITH" on the part of Tripp and Krasner, the "gatekeeper" Court authored Defendant Tripp had a "good faith" belief. The Court knew his authored statement was a lie in furtherance of Krasner's criminal activity.**

> Q.    You just stated you went to bat for me. How did you go to bat for me?
>
> A.    I went to bat for you when I spoke to Deputy Commissioner Wilson when I was with my mother and I told him that I did not believe you leaked any grand jury information.  And that was based on the fact that, to my knowledge, you did not testify before the grand jury; therefore, how could you ever leak grand jury information if you were not privy to any.
>
> So to call you in front of the grand jury and allege that you did or ask you about something that you may have done, when that person knew that you did not participate, in my opinion, is just wrong.  And I relayed that to the deputy commissioner and I probably relayed that to other people.  Who?  I don't know.  I know I relayed that to you.  And that's why I said I went to bat for you because I stood up for you because I know you did not do that because you were never there.

*Deposition of Jason Hendershot on November 17, 2023, page 128.*

70

> Q.    But you knew that what she was alleging wasn't true; is that correct?
>
> A.    Yes.

*Deposition of Jason Hendershot on November 17, 2023, page 137.*

Despite this being the "only evidence" in the record the Court chose to fabricate the record. There is not a scintilla of evidence of a "grand jury leak," including the documents hidden by Defendants and the Court under "privilege."

This a fabricated official document by the Court. A crime under 18 U.S.C. § 241 and 18 U.S.C. § 242.

437.    The Court authored:

> It is undisputed here that Jacobs made unsupported statements asserting corruption in the Philadelphia District Attorney's Office. Our Court of Appeals has explained that "[t]he public's interest in exposing potential wrongdoing by public employees is especially powerful." Baldassare, 250 F.3d at 198. Nonetheless, Defendants rightly argue that any public interest was far outweighed by the City of Philadelphia's interest in "promoting the work of the OISI Unit, maintaining a close working relationship with the District Attorney's Office, and protecting the confidentiality of grand jury material." See Pickering, 391 U.S. at 568.

*Jacobs v City of Philadelphia (19-cv-4616), Document 186, page 24.*

Once again Bartle portrayed Jacobs in a false light and intentionally defamed him by opining Defendants were "protecting the confidentiality of grand jury material," causing irreparable damage to Jacobs' career and reputation.

Q.      Prior to the podcast did the members of the Officer-Involved Shooting Investigation Unit inform you, including the Plaintiff, inform you that the District Attorney's Office was committing criminal acts?

A.      I don't recall specific conversations and when they were.  So I just don't recall.

Q.      You don't recall members of your unit telling you in group settings that the District Attorney's Office was committing criminal acts?  You don't recall any of that?

A.      I don't recall when they occurred.

Q.      So those conversations did take place, you just don't recall when?

MR. GONZALES:  Objection to the form. You can answer.

THE WITNESS:  I don't recall when they occurred.

*Deposition of Jason Hendershot on November 17, 2023, pages 40-41*

Q.      Did Detective Brian Newell tell you that the District Attorney's Office was committing criminal acts?

A.      Not that I specifically remember.

Q.      He didn't tell you that Tracy Tripp authored a false presentment to lock up Officer Ryan Pownall?

A.      I don't recall.

Q.      Detective Newell never prepared a report to you stating inconsistencies of Tracy Tripp's presentment in order to arrest Ryan Pownall?

A.      A report?  I never received an official

72

```
report, no.
     Q.     Did he ever mark up the grand jury
presentment showing the inconsistencies that Tracy
Tripp placed in the presentment to arrest Ryan
Pownall?
     A.     I vaguely remember something like that.
     Q.     And you did not consider that a
criminal act?
     A.     I don't remember exactly what anybody
else said.
```

*Deposition of Jason Hendershot on November 17, 2023 pages 42-43*

Once again, the Court fabricated an official document authoring "It is "undisputed" here that Jacobs made "unsupported" statements asserting corruption at the Philadelphia District Attorney's Office."

These are not "coincidences" by the Court. They're intentional acts in furtherance of the Philadelphia District Attorney's Office criminal activity.

Not only was Jacobs' statements SUPPORTED, the evidence in the record showed Jacobs' Commanding Officer (Hendershot) was told and admitted being told in "GROUP" settings the District Attorney's Office was committing criminal acts. Once again, an "intentional omission" by the Court to violate Jacobs' Constitutional Rights.

438.    The Court authored:

```
enforcement agencies was important."  72 F.3d at 570.  When the

detective makes unfounded accusations that the prosecutor is a

criminal, "the worst of the worst," and a "clear and present

danger," he "seriously undermine[s] the effectiveness of the

working relationship between them."  See Pickering, 391 U.S. at
```

*Jacobs v City of Philadelphia (19-cv-4616), Document 186, page 28.*

73

The question is the motive behind the Court's intentional misrepresentations of the record in favor of Defendants. Could it be Defendant(s) are employed with the Court's son, Harvey Bartle IV? Could it be another motive? Could it be racism. Could it be all of the above? One thing is clear the Court's Memorandum (Document 186) and Order (Document 187) is not a reflection of the material facts in the record.

What is clear, is the Court was the "gatekeeper" conspiring with Defendants to violate Jacobs' Constitutional Rights.

439.    Hendershot admitted conspiring with Krasner against Pownall.

> Q.    Did there come a time where Inspector Smith, prior to him leaving the detective bureau, admonish you in front of the unit?
> A.    Yes.
> Q.    Okay.
> A.    It was either Inspector Smith or Chief Inspector Kelly.  I can't recall which one.
> Q.    And what was the reason for that admonishment?
> A.    The reason for that admonishment was in regards to the presentment and subsequent arrest of Ryan Pownall.

*Deposition of Jason Hendershot on November 17, 2023, pages 91-92.*

Hendershot was admonished by Inspector James Smith for conspiring with Krasner, Tripp, Cummings, and others at Krasner's DAO to author a falsified criminal complaint to obtain an arrest warrant for Pownall.

440.

Jacobs maintains that he told Lieutenant Hendershot a

day before the podcast that he would be "doing a podcast."  He

further states that on November 26, 2019, he received oral

permission from Deputy Commissioner Wilson to "go public with

his public corruption allegations."  This latter statement is at

most a mere scintilla of evidence which no reasonable juror

could find true.  See Anderson, 477 U.S. at 252.  In a

Although Wilson publicly lied to millions, which led to the fabricated arrest of Richard Nicoletti, the Court chose to portray Jacobs in a false light and defame him by inferring he is a liar, which is the antithesis of the record and evidence.

441.     The material evidence in the record stated DF Pace "DOES NOT" conduct investigations. That is not what the Court authored, once again intentionally fabricating the record.

Disciplinary Code.  Deputy Commissioner Wilson received a copy

of the podcast and Lieutenant Hendershot's recommendation and

referred the matter for investigation.  Defendant Inspector Pace

was assigned to investigate the matter.  Pace determined that

Jacobs should be charged with "conduct unbecoming," "neglect of

duty," and "disobedience."  Jacobs resigned on March 12, 2021

*Jacobs v City of Philadelphia (19-cv-46160 Document 186, pages 13-14.*

75

Q.      Does the Police Board of Inquiry conduct any type of investigations prior to approval of disciplinary charges?

A.      No.  Let me qualify that a little bit.  The Police Board of Inquiry.  They accept a completed investigation.  We'll do quality control to make sure that the investigation is complete and correct, but we don't investigate what the investigators already investigated.  We don't second guess the investigators.  So in that sense, no.

*DF Pace Deposition September 25, 2023, page 29.*

442.     If the TESTIMONY is we do not investigate, how does the Court author an "investigation" was conducted by Defendant Pace. Both Pace and Hendershot admitted NO investigation was conducted.

443.     Furthermore "the record" indicated Wilson NEVER received the podcast prior to requesting discipline ONLY ORDERS FROM KRASNER.

444.     The Court then intentionally conspired with the defendants through premeditated actions and ex parte conversation to cause irreparable harm to the plaintiff by allowing Defendants to "adjourn" expensive deposition conducted by the pro se plaintiff to deny relevant testimony.

445.     Pace was forced by his superiors to retaliate against Plaintiff and Sergeant Christina Mellett by authoring false charges against them for the reporting of corruption.

446.     After being named in their respective lawsuits and fear of losing his law license, Pace immediately retired from the Philadelphia Police Department, sold his home, and moved from the City of Philadelphia.

447.     During Jacobs deposition of Pace, his counsel (John Gonzales) violated Hall v. Clifton Precison and stopped the deposition and conferred with his client to

76

ascertain the seriousness of the allegations and relevant questioning by the pro se plaintiff, Jacobs.

448.    When Gonzales returned, with the ex parte blessings of the Court, adjourned the deposition from this relevant line of questioning. The questions showed the pattern and practice of retaliation against PPD employees reporting corruption by Pace and the PPD.

Q.    Did Deputy Commissioner Benjamin Nash ever give you an order while you're the commanding officer of the PBI that you did not agree with?
A.    I can think of an instance where there was an order that was given that I didn't necessarily agree with.
Q.    And did you confront Deputy Commissioner Nash about that order that you didn't agree with?
A.    I shared with him my concerns about the order.

Q.    And was the concerns about you being forced to approve charges with your name on the approval line that you didn't agree with?
A.    I wouldn't say necessarily that I was ordered to approve charges that I would not agree with, no.  I was never pressured to approve charges that I didn't also agree with.

*Deposition of DF Pace on September 25, pages 49 – 50*

77

Q.    What was your confrontation or what concerns did you express to Deputy Commissioner Nash?

ATTORNEY GONZALEZ:

I'm going to object. First, this has nothing to do with your case. You're asking about some other incident that I'm not aware of and discussion. It has nothing to do with this case. So I'm going to object and ask that you move on.

Because first of all, I do not believe that Deputy Commissioner Nate Nash was in charge of the PBI at the time that your charges were pending, and so there would have no relevance to your case.

BY MR. JACOBS:

Q.    So once again, what was your confrontation with Deputy Commissioner Nash about?

ATTORNEY GONZALEZ:

First, I am objecting to

your mischaracterization.  The witness never used the term confrontation.  That's number one.  Number two, it has nothing to do with this case.

This is the best I'm going to do for you.  I'm going to take a break.  I'm going to discuss this issue with my client so I have more information before I decide whether or not I will allow the witness to answer the question or whether or not we're going to have to adjourn again, because you're asking questions that have nothing to do with your case.

All right.

So we're going to take five minutes and we'll be right back.

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

ATTORNEY GONZALEZ:

All right.

So I had a conversation --- we're back on the record.

I had a conversation with my client regarding the questions that you are asking, Mr. Jacobs. And based upon my discussion with my client, I do not believe that any of the questions that you have asked with respect to Inspector or Chief Inspector or whatever --- Inspector Nash?

*Deposition of DF Pace on September 25, 2023, pages 52 – 55.*

MR. JACOBS:

Well, that's not what's going on here. I do wish to proceed with this deposition at this time. The fact of the matter is, just as in the last deposition, you are refusing to answer the questions.

Now, what could occur is he could answer the questions, you can object, and Judge Bartle can render a decision whether to strike his answer or not, but we can proceed with that. The fact that you do not want your client, as in the previous deposition, to answer the question speaks volumes. Inspector Pace, as you just stated previously, you didn't know anything about this matter. It's not my fault your client chose not to update you. But Inspector Pace knows exactly the, quote, unquote,

81

conversation he had with Inspector Nash and why he had that conversation with Inspector Nash. Maybe he didn't know that I knew, but I do.

So if you choose to adjourn because you're refusing to have your client answer a question that is relevant in this matter, then you can adjourn it. You can adjourn it, and your client can adjourn it, and then you can file appropriate motions with the court.

ATTORNEY GONZALEZ:

All right.

We are adjourned. Thank you. Kelly, I do want to get a copy of the transcript, expedited if possible.

Deposition of DF Pace on September 25, 2023, pages 61 – 62.

449.     After the intentional adjournment of multiple depositions, the Court held a "conference." The Court NEVER held "evidentiary" hearings to place ON THE RECORD his obvious conspiratory relationship with the defendants.

450.     After the "conference" the Court DENIED the plaintiff the opportunity to ask relevant questions of the defendants. Pace resigned because he was forced file false charges against Jacobs.

82

Q.    You left the Police Board of Inquiry and went to night commander; is that correct?

A.    That's correct.

Q.    And subsequently you left the Philadelphia Police Department for a little while; is that correct?

A.    That's correct.

Q.    And it was a result of being named in a lawsuit, this lawsuit, and your dispute with Inspector Nash with approving charges at the PBI and being named in the lawsuit; is that correct?

MR. GONZALES:    I'm going to object and instruct the witness not to answer.  The court has already instructed you, Mr. Jacobs, that any questions related to this topic are outside the bounds of discovery in this case and are to be prohibited?

BY MR. JACOBS:

Q.    I want to on get the record that he left the police department and the PBI because he was a named litigant in this lawsuit and he disagreed with it.

MR. GONZALES:  You're not putting anything on any record.  You're just stating things that are coming from your mouth and I'm instructing the witness not to answer.  The court has already ruled on this in his October 5, 2023 order.

Deposition of DF Pace on November 27, 2023, page 108-109

451.    *So, as you can clearly ascertain this is a relevant question. This is clearly a line of questioning a reasonable juror would want answered. The Court clearly conspired with Defendants and was the "gatekeeper" in the violation of Jacobs' Constitutional Rights, Did the defendant have a dispute with his superiors because he filed false charges against Jacobs? As a result, the defendant, admitted to retiring from the PPD. As counsel clearly noted, the Court did not allow the pro se black plaintiff, who had his family destroyed, the ability to obtain material facts relevant to his claims.*

Q.    Was Detective Jacobs off duty when he made those statements?

A.    I don't know.

Q.    Was Detective Jacobs using his own equipment when he made those statements?

A.    I don't know.

Q.    Okay.

A.    Nor does it matter.

Q.    For the record this is Philadelphia Police Department directive on Social Media and Networking, Directive 6.10.  I'm going down to the policy, which is under section 4G, and it states, employees who are off-duty and using privately-owned property to engage in the personal use of social media do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity.  Under such conditions, employees represent only themselves and their personal interests.  Did I read that correctly?

A.    Yes, you did.

Deposition of DF Pace on November 27, 2023, Page 74

84

Q. Well, if the commanding officer -- strike that.

Did you know that the commanding officer falsified an affidavit to arrest a Philadelphia police officer?

A. I don't even agree with your assessment. You're asking me do I know that someone intentionally falsified something?

Q. Correct.

A. I don't even know how to respond to that.

MR. GONZALES: Why don't we take ten minutes. Off the record.

* * * * *

(Whereupon, a brief recess was taken.)

* * * * *

Deposition of DF Pace November 27, 2023, Page 76-77

452.     Once again violation of Hall.

A. At the time you did not. You went on a podcast. That was the improper channel.

Q. Once again, do you know whether or not Detective Jacobs, prior to the podcast, pursued the proper channels as you described them?

A. I do not know.

Q. So --

A. I only know what you told me.

Q. Right. So when you placed in that disciplinary document that Detective Jacobs did not pursue the proper channels, you know that's a false statement --

Deposition of DF Pace on November 27, 2023, page 102.

85

**MEMORANDUM**

POLICE
**CITY OF PHILADELPHIA**

**DATE** 11/18/2019

TO        : Police Commissioner, Christine Coulter

FROM   : Detective Derrick Jacobs #9116

SUBJECT :  <u>URGENT MATTER REGARDING DETECTIVE DERRICK JACOBS #9116</u>

1. On October 4, 2019, I sent a direct and discreet email to you regarding an "Urgent Matter". Other than a response "Received Sir", to date I have not received any correspondence regarding the urgent matter.

2. The matter in question are what I believe to be criminal acts that were committed against me by the Philadelphia District Attorney's Office and Assistant District Attorney (ADA). Tracy Tripp as a result of my performance and duties as a Philadelphia Police Detective. ADA Tripp deprived me of my Constitutional Rights and intentionally inflicted emotional distress on me and my family while acting in her capacity as an Assistant District Attorney.

3. I would like a meeting at your earliest convenience to discuss these "urgent matters".

4. Your consideration is greatly appreciated.

**Disapproved**

NOV 19 2019

Chief Inspector
Detective Bureau

#911C

Detective Derrick Jacobs #9116
OISI Unit

Reviewed by
Lt. Hendershot #148
OISI UNIT

**DISAPPROVED**
Deputy Commissioner

NOV 2 1 2019

DW.

Special Operations
The PPD is not the
proper Authority to
investigate victimization
by the DA's office. Refer
this complaint to the Attorney
General's office.

## EXHIBIT 3

MONDAY, NOVEMBER 18, 2019

### Detective: D.A. Tampered With Witness In Officer Involved Shooting

**By Ralph Cipriano**
**for BigTrial.net**

Derrick "Jake" Jacobs was one of the detectives assigned to investigate the 2017 fatal police shooting of dirt biker David Jones.

The victim was black; Ryan Pownall, the officer who pulled the trigger, was white. Jacobs, who is black, says that race played no part in his investigation, which



Police Officer Facing Murder Charges
Deadly Confrontation in June 2017

exonerated the officer; neither did any supposed loyalty to his fellow cops.

The defendants never addressed Jacobs' multiple memorandums through "proper channels" until after Ralph Cipriano of Bigtrial.net published Jacobs' lawsuit on November 18, 2019.  Krasner called Wilson, which resulted in the November 26, 2019 meeting in Wilson's office.

It gets worse!

86

453.    After the article regarding Jacobs' Federal Civil Rights complaint was published on Bigtrial.net, Larry (Lawrence) Krasner jumped into action, fearing his criminal actions were being exposed. Krasner immediately contacted his co-conspirator Deputy Police Commissioner Dennis Wilson.

454.    The defendants, who said Jacobs did not follow the "proper channels, did not inform Philadelphia Police Commissioner Christine Coulter from the illegal and retaliatory actions.

455.    Coulter informed Jacobs during a deposition Defendants did not inform her of their actions against Jacobs and THEY SHOULD HAVE, in violation of department policy.

```
     Q.   So if a memorandum from a
subordinate is submitted up the chain of
command to the police commissioner, the
police commissioner should receive that
memorandum, approve or disapprove it and send
it back down the chain of command to the
member who authored it; is that correct?
               MR. SHEEHAN:  Objection to
form.
                  You can answer.
     A.   That is correct.
```

*Deposition of Christine Coulter on April 28, 2022, Page 48.*

```
     Q.   Did Deputy Police Commissioner
Wilson inform you that he was initiating a
disciplinary investigation against Plaintiff
Jacobs?
     A.   He did not.
```

*Deposition of Christine Coulter on April 28, 2022, Page 59*

Q.    So as we sit here today on April the 28, of 2022, Deputy Commissioner Wilson never informed Police Commissioner Coulter or First Deputy Police Commissioner Coulter of any disciplinary investigations initiated against Plaintiff Jacobs.

A.    Not that I recall, no, sir.

Q.    Can you think of any reason why Deputy Police Commissioner Wilson would not inform you that he was initiating a disciplinary investigation into Plaintiff Jacobs?

A.    I can't.

Q.    Have you ever known Detective Jacobs to smear the Philadelphia Police Department?

MR. SHEEHAN:    Objection to

form.

You can answer.

A.   No, I don't.  I don't have any first-hand information of that.

BY MR. JACOBS:

Q.   Would Defendant Deputy Commissioner Wilson initiating a disciplinary investigation into a plaintiff in pending litigation, in your opinion, would that seem retaliatory?

MR. SHEEHAN:  Objection to form.

A.   I don't know when or at any time when Wilson, such as myself, was informed that there was litigation, so I wouldn't know -- if someone knew there was litigation and it wasn't a legitimate reason, that would be retaliation.  But it would have to have both of those factors.  You would have to know that you were a defendant and you would have to know that what you were alleging wasn't true in order for it to retaliate.

*Deposition of Christine Coulter on April 28, 2022, Pages 65-67.*

Q.   But, once again, to go back just to drive this point home, you should, in your opinion, have been notified of this investigation.

A.   Well, which investigation?

Q.   The investigation into Plaintiff Jacobs.

A.   If it was the one you're speaking about conduct unbecoming, yes.  I'm not really sure which investigation you're referencing now.

Q.   That is the investigation that I'm speaking of.

A.   Yes.

*Deposition of Christine Coulter on April 28, 2022, Page 70.*

89

Q.   Okay, let me rephrase it for you.

You stated that when Plaintiff Jacobs submitted the memorandum to you or e-mail, you reached out to Marcel Pratt and Brian Abernathy and they returned that this matter should be investigated by the attorney general's office and you relayed that information to Deputy Police Commissioner Wilson.  And Deputy Police Commissioner Wilson informed you that he relayed that information to Plaintiff Jacobs, correct?

A.   Correct.

Q.   So if Plaintiff Jacobs informed Deputy Police Commissioner Wilson that there was a conflict of interest because of the attorney general's involvement in the matter, should he have brought that to your attention?

A.   Yes, he should have.

Q.   So do you have, can you provide any reason that Deputy Police Commissioner Wilson would not have shared that information with you?

A.   No.

Q.   If he had shared that information with you, would you have sought other avenues for a possible investigation?

A.   I'm sure that I would have gone back to seek other advice as to what other avenues would be available, if any.

*Deposition of Christine Coulter on April 28, 2022, Pages 81-82.*

Q.   Yes.  Let me rephrase.

Have you ever seen Detective Jacobs on television disparaging the Philadelphia Police Department?

A.   I have not.

Q.   Have you ever heard of Detective Jacobs violating policy that disparaged the Philadelphia Police Department?

A.   I have not.

*Deposition of Christine Coulter on April 28, 2022, Pages 86 – 87.*

456.       That is the record. The Philadelphia Police Commissioner, Christine Coulter, testified she has never heard of Detective Jacobs violating policy. Coulter further testified the facts as alleged would be considered retaliation for exposing corruption and she was not and should have been notified of the illegal disciplinary actions taken against Jacobs. Coulter further testified that had she been notified, she would have sought additional remedies to protect Jacobs' civil rights.

458. JUDGE HARVEY BARTLE III HAD MULTIPLE EX PARTE CONVERSATIONS WITH THE DEFENDANTS OUTSIDE OF HIS JUDICIAL RESPONSIBILITY. A FEW EXAMPLES OF THE FABRICATIONS, BIAS, AND CONSPIRATORIAL ACTIONS IN FURTHERANCE OF THE CRIMINAL ACTIVITY IS LISTED BELOW.

a. Denied Jacobs Injunctive Relief without any opposition on the record from the defendants.

b. Removed the City of Philadelphia as Defendant without any motion from the defendants and/or plaintiff.

c. Removed Nicole Morris as counsel of record for defendants without any motion for withdrawal in the record.

d. Authored a fabricated order and material record that stated Asa Khalif is "unaffiliated" with the defendants and/or District Attorney's Office without any information in the record, other that his "affiliation" with the DAO.

UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | | |
|---|---|---|
| Derrick Jacobs | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 19-cv-4616 |
| | ) | |
| City of Philadelphia, et al. | ) | |
| *Defendant* | ) | |

**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

To: Asa Khalif (Philadelphia District Attorney's Office)

*(Name of person to whom this subpoena is directed)*

*Jacobs v City of Philadelphia (19-cv-4616) Document 122-7*

1.    Plaintiff also issued a subpoena to Asa Khalif who appears
to be unaffiliated with the Philadelphia District Attorney's
Office.

*Jacobs v City of Philadelphia (19-cv-4616) Document 132.*

*Who provided the Court with this authored information that is a clear fabrication intentionally placed in the record.*

e. Allowed a law clerk (Jeremy Gradwohl) who had a previous adversarial relationship with Plaintiff to participate in the matter. The Court then authored a fabricated document without any material support, stating the adversarial relationship never existed. *Note: Plaintiff has documentation.* There is not a scintilla on information supporting the Court's "version." *19-cv-4616, Document 58. Motion for Recusal.*

1.    In support of his motion, plaintiff alleges in part that
the law clerk assigned to work on this case had an adversarial
relationship with him prior to the law clerk's employment with
the court.  The court disagrees that any such adversarial
relationship ever existed.  In any event, the law clerk
currently assigned to the case is other than the one previously
assigned.

Dear Mr. Jeremy Gradwohl,

   This letter is a response to our conversation on Friday, October 13, 2017, at approximately

3:59 pm. After our conversation, it left me with some concerns and I wanted to address them in

this letter. When I first made the call I thought it was someone else, but you stated that it was

you. Later, you went on to ask who you were speaking with and I answered, Derrick Jacobs,

your tone immediately became harsh. I ignored it, and went back to the topic of the conversation,

92

How can the Court "disagree" without any testimony, evidentiary hearing, and/or material facts supporting or disproving the claim. Only information in the record is the BLACK decorated Law Enforcement Officer is making the claim, so it's only 3/5 true. Is there a statement from Jeremy Gradwohl. Why did the Court not inform Plaintiff of his clerk's involvement?

e. Authored the fabrication that John Ellis participated in the grand and was exposed by Jacobs as witness #6. *Witness #6 WAS NOT John Ellis. John Ellis DID NOT participate in the grand jury. This was an egregious act to portray Jacobs in a false light and defame him by indicating he exposed a grand jury witness.*

The Court adopted Defendants "version" at every turn fortifying his position as gatekeeper. The Court and Defendants cannot produce a scintilla of evidence identifying Ellis as participating in the grand jury of Pownall.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS                    :      CIVIL ACTION
                                  :
         v.                       :
                                  :
CITY OF PHILADELPHIA, et al.      :      NO. 19-4616

ORDER

AND NOW, this  11th  day of September 2023, it is hereby ORDERED that the motion of the plaintiff for sanctions against the City of Philadelphia and Philadelphia District Attorney Lawrence Krasner (Doc. #122) is DENIED.

_____

Derrick Jacobs, a former Philadelphia police detective, proceeding pro se, brings First Amendment retaliation claims and conspiracy claims under 42 U.S.C. § 1983 against Philadelphia Assistant District Attorney Tracey Tripp and three members of the Philadelphia Police Department:  Chief Inspector Dennis Wilson, Inspector D.F. Pace, and Lieutenant Jason Hendershot.  Before the court is the motion of the plaintiff for sanctions against non-parties City of Philadelphia and Philadelphia District Attorney Lawrence Krasner.  Plaintiff issued two subpoenas for a deposition of Krasner.[1]  He avers that Krasner failed to appear for either deposition.

_____

1.   Plaintiff also issued a subpoena to Asa Khalif who appears to be unaffiliated with the Philadelphia District Attorney's Office.

93



*Asa Khalif at Kimbrady Carriker press conference with Krasner*



*Asa Khalif Nicolletti protest of OIS of Krasner's client Jeffrey Dennis.*

On that same day, the Defendant filed a Motion seeking the transcripts and materials from the Grand Jury proceedings. *See* 234 Pa. Code Rule 230(B)(3).[3] On December 11, 2019, Judge Coleman granted the Defendant's Motion and the materials were delivered to the Defendant on December 12, 2019. On December 18, 2019, within a week of receiving the transcripts, the Defendant filed a Motion to Quash the Presentment and for Dismissal of All Charges. Before this Court could rule on the Defendant's Motion to Quash, the Commonwealth

*Judge Barbara McDermott's Findings of Fact dated October 17, 2022, page 2.*

94

457.    When Jacobs filed his original complaint (19-cv-4616) with the Court (Bartle) he was a sworn law enforcement officer. Jacobs provided the Court with a plethora of material facts and evidence showing criminal activity by Defendants. The Court chose to abdicate its judicial oath and responsibilities and decided to conspire with the defendants in furtherance of their criminal activity.

*Krasner's Corruption Act VIII*

*Giglio Letter*

458.    On April 4, 2025, the Defendants once again continued their onslaught of perpetual retaliation against Jacobs.

459.    On April 4, 2025, Krasner's DAO figured their next course of action was to permanently defame Jacobs for reporting their corruption.

460.    On April 4, 2025, Krasner's DAO emailed a "Giglio" letter to the plaintiff at derrickjacobs9116@gmail.com.

461.    The Giglio Letter issued to Jacobs stated the following: **"The District Attorney's Office has learned of Brady/Giglio information relating to a judicial finding by United State District Judge Harvey Bartle III, including but not limited to findings that you "revealed grand jury information" to a criminal defense attorney and "revealed confidential information on a podcast."**

462.    Krasner's policy and practice and knowledge of the City of Philadelphia knowingly, intentionally and recklessly portrayed Jacobs in a false light and known defamatory letter in concert with Bartle. As a result Jacobs has suffered irreparable damage.



**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
215-686-8000

April 4, 2025

Derrick Jacobs

<span style="background:black">████████████</span>
<span style="background:black">████████████████████</span>

Re:    Derrick Jacobs (Payroll: 223879)
       Notification letter
       DAO *Brady*/*Giglio* disclosure of rebuttable presumption information

Dear Mr. Jacobs:

The District Attorney's Office has learned of *Brady/Giglio* information relating to a judicial finding by United State District Judge Harvey Bartle III, including but not limited to findings that you "revealed grand jury information" to a criminal defense attorney and "revealed confidential information on a podcast."

Sincerely,

*Michael Garmisa*
Michael Garmisa
Assistant District Attorney
Supervisor — Conviction Integrity Unit

### *Krasner's Corruption Act IX*

### *Krasner's DAO "LACKED CANDOR"*

463.    Not one, not two, not three, not four, but "**EVERY**" Judge or Justice who viewed and examined Krasner and his DAO, with the "**exception**" of Judge Harvey Bartle III deemed the Defendants "lacked candor" and/or was disingenuous to the Courts.

464.    **Pennsylvania Common Pleas Court Judge Barbara McDermott.**

The Commonwealth made an intentional, deliberate choice not to inform the grand jurors about the justification defense under Section 508. While former ADA Tripp was aware of Section 508 and its applicability to the Defendant's case at the time of the Grand Jury proceedings, she decided not to advise the Grand Jury about Section 508 after consulting with other, more senior Assistant District Attorneys.

96

*Judge Barbara McDermott's Findings of Fact dated October 17, 2022, page 6.*

apply to the Defendant's case as it would amount to an *ex post facto* law otherwise.[6] The

Commonwealth cannot subsequently represent that this defense would terminate or substantially

handicap its prosecution, but refuse to advise the Grand Jury about it.[7]

[6] *Ex post facto* laws are prohibited under Article 1, Section 10, Clause 1 of the United States Constitution.

[7] The Commonwealth was still ready to proceed to trial after receiving an adverse ruling on appeal despite arguing that the application of the jury instruction for Section 508 would terminate or substantially handicap their prosecution.

*Judge Barbara McDermott's Findings of Fact dated October 17, 2022, page 8.*

465.     **Federal Court District Judge in the Eastern District of Pennsylvania Mitchell Goldberg.**

Based on the foregoing, I find that the Law Division Supervisor, Assistant Supervisor and the District Attorney's Office violated Rule 11(b)(1) by asserting without "evidentiary support" or an "inquiry reasonable under the circumstances" that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984)" and that it had done so "[f]ollowing … communication with the victims' family." I also find that the violation was sufficiently "egregious" and "exceptional" under the circumstances of this case to warrant sanctions under Rule 11.

*Judge Goldberg memorandum opinion dated September 17, 2022, page 25.*

(b) REPRESENTATIONS TO THE COURT. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
    (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

466.     **Pennsylvania Common Pleas Court Judge Ann Marie Coyle**

*"I don't believe for one millisecond that the documents at issue weren't intentionally misplaced. I believe they were intentionally misplaced. I believe at this point in time there are certain documents that are -- that have been destroyed, omitted, moved, misplaced, what have you."*

467.     **Municipal Court Judge Karen Simmons**

"And at that point," the judge told Black's supervisors, "I realized I had had enough because if I can't trust Miss Black or anyone else from the District Attorney's office who are prosecuting these cases . . . then I don't know what to do with you, actually, I really don't."

"Because as a judge, I cannot, I will not, I do not go out and investigate every comment and statement that's made from the attorneys that appear in front of me," the judge said. "That I have to and I must rely on the authenticity and the honesty of the lawyers that appear in front of us. All of us judges must."

The judge told Black's supervisors that she had concluded "Miss Black's actions were inappropriate, they were wrong, they were intentional."

"They do rise to the level of prosecutorial misconduct," the judge said, but it didn't reach the

*Prosecution of Carl Holmes*

468.     **Pennsylvania Common Pleas Court Judge Rose Defino-Nastasi**

*"As to Counsel's duty of candor toward a tribunal, frankly, it is indiscernible to this Court whether Counsel was willfully deceitful or just inadvertently so, because the Commonwealth's pleadings have created a confusing web of contradictions for this Court to have to sift through."*

469.     **Third Circuit Court of Appeals Judge Stephanos Bibas**

BIBAS, *Circuit Judge*.

Courts rely on lawyers' honesty; lawyers may not mislead them. But the Philadelphia District Attorney's Office did just that. It conceded that a court should vacate Robert Wharton's death sentence. Yet in doing so, it did not comply with this Court's instruction to investigate evidence cutting against Wharton's habeas claim. Nor did it disclose key facts about that claim. So the District Court found misconduct, directed the Office to be more forthcoming in the future, and ordered District Attorney Larry Krasner to apologize. Because those mild sanctions were well within the court's sound discretion, we will affirm.

## DISCUSSION

470.     Jacobs hereby incorporates all prior paragraphs as if fully set at length herein.

471.     Judge Harvey Bartle III was the "gatekeeper" to in the denial of Jacobs' Constitutional Rights to a jury trial, a jury trial that Defendants could not prevail if Jacobs' peers heard the material facts.

472.     Judge Harvey Bartle III "cherry-picked" facts not in the record. Judge Harvey Bartle III "cherry-picked" bias statements. Judge Harvey Bartle III "cherry-picked" lies.

473.     The FACTS reflect the clarity of the conspiracy to deprive.

## ARGUMENT

## COUNT ONE

## FIRST AMENDMENT RETALIATION

## 42 U.S.C. § 1983

474.     The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

475.     The Retaliatory actions described above, alone or in combination have retaliatory character and are per se retaliatory for the following reasons, among others.

476.     The retaliatory actions were a direct result of Jacobs exposing corruption and criminal activity by the City of Philadelphia and in particular the Philadelphia District Attorney's Office headed by Philadelphia District Attorney Lawrence Krasner.

## COUNT TWO

### DEFAMATION

477.    The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

478.    The Defamatory Statements described above, alone or in combination have defamatory character and are per se defamatory for the following reasons, among others.

    a.    They ascribe to Plaintiff conduct, character, or a condition that adversely reflects upon his fitness and/or perceived fitness to be in any position of trust, including a law enforcement officer.

    b.    They ascribe to Plaintiff acts and failures to act that are improper and unlawful and impugn his integrity and blacken his personal and professional reputation.

    c.    They expose the Plaintiff to hatred, contempt, or ridicule, and injure him in his business and/or profession.

    d.    They lower Plaintiff in the estimation of the recipients of the statements and deter third persons including potential employers, clients, and/or co-workers from associating with her or employing her in any capacity.

479.    The accusation that Jacobs "leaked" grand jury information is an explicit accusation of criminal conduct.

480.    The false description of Jacobs leaking grand jury information and revealing confidential information cast Jacobs as someone who would violate his oath.

481.    Any and all persons who have read or heard, or will read or hear the above Defamatory Statements understood, and will understand, the same as having a defamatory meaning.

482.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another, understood, and will understand, the same as having defamatory meaning.

483.    Any and all persons who have read or heard or will read or hear the above Defamatory Statements will understand that the same applies to Plaintiff.

484.    Any and all persons who have learned, or will learn, about the above Defamatory Statements from another understood and will understand, that the same applies to Plaintiff.

100

485.     The above Defamatory Statements are FALSE.

486.     The Defendants at all material times were acting in the course of their capacity as public officials and or employees for the City of Philadelphia in preparing the false and defamatory statements and documents.

487.     The City of Philadelphia are vicariously liable for the conduct of Krasner and other City employees, who at all times material hereto, authorized and were acting as authorized agents of the City of Philadelphia.

488.     Instead of seeking the truth, Defendants tried to conceal the unreliability of their false statements by falsifying documents, cherry-picking documents, and hiding the documents behind "privilege" and knowingly, recklessly, and intentional criminal "judicial" decisions.

489.     The Defendants knew that the statements about Jacobs were false, yet nonetheless continued to include them in numerous documents, including but not limited to, the "Giglio" notice to Jacobs.

490.     The Defendants delivered and published the Defamatory Statements with actual malice and/or a reckless disregard for the truth of the statements expressed therein.

491.     As a direct and proximate result of the delivery and publication of the Defamatory Statements Plaintiff has suffered injury, including but not limited to:

a. The Defamatory Statements ascribe to Plaintiff conduct, character, or a condition that adversely reflects upon, and have and will adversely reflect upon, his fitness and/or perceived fitness to be in any position of trust, including as a law enforcement officer.

b. The Defamatory Statements ascribe to Plaintiff acts and failures to act that are improper and unlawful and impugn his integrity and blacken his personal and professional reputation.

c. The Defamatory Statements expose Plaintiff to hatred, contempt, or ridicule, and injure him in his profession and/or business.

d. The Defamatory Statements lowered Plaintiff, in the estimation of the recipients of the statements and deter third persons including potential employers, clients, and co-workers from associating with and/or engaging with him or employing her in any capacity.

e. Devastating, sustained mental suffering; and

f. Elimination of any remaining earning capacity as a law enforcement officer or investigator.

Wherefore, Plaintiff request judgment in his favor against Defendants, jointly and severally, in an amount excess of $75, 000 sufficient to fully compensate him, together with punitive damages, interest, cost of suit, and such further relief deemed equitable and just.

## COUNT THREE

### FALSE LIGHT

492.    The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

493.    All the above statements were false and Defendants maliciously disregarded the falsity of such statements.

494.    Defendants made these statements with the intent of harming Plaintiff's reputation in the eyes of his peers and members of his community so that Jacobs would be deemed dishonest and regarded as a person of low moral character who would violate the constitution and his oath.

495.    These include the false claim that Jacobs "revealed grand jury information."

496.    These include the false claim that Jacobs revealed "confidential information on a podcast."

497.    This conduct is among the most reprehensible behavior that could be ascribed to a law enforcement officer and is considered criminal.

498.    As a direct and proximate cause of said false statements, Jacobs' reputation has been damaged and his earning capacity has been greatly diminished.

499.    The statements were made with the intent that Jacobs' peers and community would receive in particular.

500.    Defendants intentionally cast Jacobs in a false light by falsely stating he committed egregious misconduct and knowingly and/or recklessly disregarded the constitution and his oath.

501.    Defendants' false statements described above casting Jacobs in a false light would be highly offensive to a reasonable person.

502.    The false statements were published to a wide public audience.

503.    As a direct and proximate result of the Defendants casting Jacobs in a false light, Jacobs has suffered severe and permanent damage as set forth above.

WHEREFORE, Plaintiff requests judgment in his favor against Defendants, jointly and severally, in an amount in excess of $75, 000 sufficient to fully compensate

102

him, together with punitive damages, interest, cost of suit, and such further relief deemed equitable and just.

## COUNT FOUR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

504. The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

505. The conduct of the Defendants – knowingly disseminating lies about Jacobs, falsely accusing him of unethical and criminal conduct was extreme and outrageous.

506. Defendants intended to cause Jacobs emotional distress or acted recklessly to the likelihood that their actions would cause emotional distress.

507. As a direct and proximate result of the Defendants' conduct Jacobs suffered severe and permanent emotional distress, as well as physical harm, including insomnia and anxiety.

508. WHEREFORE, Plaintiff requests judgment in his favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate him, together with punitive damages, interest, cost of suit, and such further relief deemed equitable and just.

## COUNT FIVE

### CIVIL CONSPIRACY VIOLATION OF SEVENTH AMENDMENT RIGHT TO JURY TRIAL

509. The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

510. *The Seventh Amendment of the United States Constitution states the following:* **In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.**

511. The conduct of the Defendants, knowing, intentionally, and with reckless abandon conspired to deprive Plaintiff of an unalienable Right of a trial by jury, which Plaintiff DEMANDED.

512. Judge Harvey Bartle III conspired through ex parte communications and actions with the Defendants to act outside the purview of his judicial responsibilities to author a Memorandum that was DEVOID of material facts in the record and cause irreparable damage to Plaintiff.

513.     Judge Harvey Bartle III knowingly, intentionally, and recklessly engaged in a criminal and civil conspiracy with the defendants to violate Plaintiff's Seventh Amendment Rights to a jury trial by agreeing to be the "gatekeeper" of Plaintiff's Seventh Amendment Rights DEMAND of a JURY TRIAL.

### *TITLE 18, U.S.C., SECTION 241*

*If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; ... They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

### COUNT SIX

### CIVIL CONSPIRACY

514.     The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

515.     The City of Philadelphia is liable for the Defendants' actions. Krasner is a policymaker for the City of Philadelphia.

516.     All Defendants had a common purpose of unlawfully authoring, publishing, promoting, and distributing false and defamatory statements of and concerning Plaintiff with actual malice.

517.     As set forth fully above, all Defendants knew or should have known that the statements about Plaintiff and the characteristics attributed to Plaintiff were false, and took overt acts in furtherance of their common goals and purpose.

518.     However, in an effort to author, publish, promote, and distribute such false defamatory statements, Defendants ignored and purposely avoided the truth and/or purposely made false statements about Plaintiff with malice and without legal justification.

519.     Defendants had an express purpose of accusing Jacobs of misconduct.

520.     The City of Philadelphia allowed Defendants to act with impunity despite clear public evidence that Defendants were unreliable, unethical, and lacking in credibility.

521.     All Defendants each benefited from the publication of the false defamatory statements.

522.     As a direct and proximate result of Defendants' unlawful acts and conspiracy to retaliate, defame and cast Plaintiff in a false light, he has suffered substantial harm and damage to his reputation.

523.     As a further direct and proximate cause of Defendants' actions, Plaintiff has suffered and will continue to suffer severe emotional and psychological harm, as well as loss of standing within his profession.

524.     Defendants' conduct as described herein was clearly outrageous, shocking, intentional, and done with actual malice, justifying punitive damages.

525.     WHEREFORE, Plaintiff requests judgment in his favor against Defendants, jointly and severally, in an amount in excess of $75,000 sufficient to fully compensate him, together with punitive damages, interest, cost of suit, and such further relief deemed equitable and just.

## *DEPRIVATION OF RIGHTS UNDER THE COLOR OF LAW*

### *18 U.S.C. § 242*

526.     The plaintiff incorporates all preceding paragraphs of the complaint as if fully set herein.

527.     *Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights,privileges, or immunities secured or protected by the Constitution of the United States.*

528.     *Whoever Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.*

529.     *For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim.*

105

**NOTICE OF PRESERVATION**

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE ALL NECESSARY ACTIONS TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATION, WHETHER ELECTRONIC OR OTHERWISE.

**JURY TRIAL DEMANDED**

Date:   3/20/2026

_____

Derrick Jacobs, Pro Se Plaintiff